UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PERCY CURRY, RICK BANKS, III,
MARIE HILLARD, individually and on
behalf of all other similarly situated
persons,

Case Number 06-11728
Honorable David M. Lawson

Plaintiffs,

v.

SBC COMMUNICATIONS, INC., a.k.a.
AT&T, Inc., and COMMUNICATION
WORKERS OF AMERICA LOCAL 4108,

Defendants.
_____/

## OPINION AND ORDER DENYING MOTION CLASS CERTIFICATION

This putative class action was filed by the three named plaintiffs who allege racial

discrimination by their employer and their union local, claiming that the defendants' actions created

a hostile work environment and resulted in disperate treatment in violation of state and federal law.

The plaintiffs seek to certify the matter as a class action under Federal Rule of Civil Procedure

23(b)(2), which is appropriate when "the party opposing the class has acted or refused to act on

grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory

relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Both defendants

vigorously oppose the motion. The Court heard oral arguments on the motion on December 6, 2007,

at which time the plaintiffs argued that their claims for declaratory and injunctive relief predominate

over their claims for damages. The Court now finds that the argument is untenable; Sixth Circuit

precedent compels the contrary conclusion, and therefore the Court will deny the motion for class

certification.

# I.

The plaintiffs, Percy Curry, Rick Banks, III, and Marie Hillard, commenced this putative class-action on April 10, 2006 asserting counts for (1) race discrimination in violation of Title VII, (2) race discrimination in violation of 42 U.S.C. § 1981, and (3) race discrimination in violation of the Elliott-Larsen Civil Rights Act. They named as defendants SBC Communications, Inc. (now a part of AT&T), Communication Workers of America, and Communication Workers of America Local 4108. The national union has since been dismissed, and the plaintiffs filed an amended complaint against SBC and the union local only.

As modified by their present motion for class certification, the plaintiffs seek to prosecute this complaint on behalf of "all African Americans whom SBC employed and who were members of Local 4108 in SBC's Saginaw, Michigan office during the longest period of time permitted by the applicable statute of limitations." Br. in Sup. of Mot. for Class Cert. [dkt # 76] at 19. In the alternative, the plaintiffs submit that certification should at least be forthcoming with respect to African Americans employed on the third floor of SBC's office building in Saginaw, Michigan during the relevant time period.

In their amended complaint, the plaintiffs set forth "pattern allegations" that pertain to all class members, as well as individual narratives recounting the specific events encountered by the named plaintiffs. It is most expedient to quote their pattern allegations in full:

## A. Pattern Allegations

18. During Plaintiffs' employment with SBC and membership in the Local Union, SBC, aided and abetted by the Local Union (and in many cases with active participation of the Local Union), engaged in a pattern and practice of discriminatory conduct, including, but not limited to:

(a)     failing to promote African American employees;

(b)     underutilizing African American employees;

(c)     engaging in occupational segregation;

(d)     considering race when making employment decisions such as hiring, training, promoting, transferring, or assigning duties;

(e)     failing to credit African American employees for their experience on the same basis as white employees and failing to consider African American employees for timely promotions or title changes on the same basis as white employees;

(f)     systematically paying African American employees lower wages and/or denying African American employees opportunities to increase their earnings and perform jobs for additional compensation;

(g)     subjecting African American employees to racial and other types of harassment to which white employees were not subjected;

(h)     failing to enforce anti-discrimination and anti-harassments [sic] policies and failing to adequately train SBC employees in anti-discrimination and anti-harassment policies;

(i)     systematically transferring or demoting African American employees or otherwise altering the terms of their employment with the intent to adversely affect their earnings;

(j)     negligently hiring or retaining employees, including supervisors, with known propensities to discriminate against African Americans;

(k)     ignoring complaints of discrimination and harassment made by African American employees;

(l)     retaliating against African American employees who complained of discrimination and harassment, including subjecting them to further discrimination and harassment, terminating their employment, and constructively discharging them;

(m)     making significant employment decisions based on racial stereotypes; and

(n)     refusing to take adverse actions against SBC employees and the Local Union representatives, including supervisors, who engage in racial discrimination and harassment.

Amend. Compl. [dkt # 58] at ¶ 18. According to the plaintiffs, these practices pervade all aspects of employment and have led to the creation of a hostile work environment at SBC's Saginaw office.

Plaintiff Curry, who worked for SBC at its Saginaw office from June 2004 to May 2005, alleges that he was subject to a number of discriminatory actions and treated differently than white employees. Among other things, Curry claims that: (1) he was harassed for working too slowly, even though many white employees worked more slowly than him; (2) he was not allowed to keep a fish at his desk (presumably alive and in a fish bowl), whereas a white employee was permitted

to do so; (3) a union official hung a noose in front of the SBC elevator banks, where it remained for over fourteen hours, and, upon hearing Curry's complaints, white managers told Curry to "stop living in the past" and failed to discipline the offending union official in any meaningful way, Compl. at ¶ 31; (4) he was reprimanded for speaking with other African American employees, whereas white employees were able to speak with one another with impunity; (5) he was physically grabbed and forced back to his chair by one of his managers, Debra Akright, on numerous occasions; (6) he was separated from white employees and placed with African American employees near Akright's office for monitoring purposes; (7) he was reprimanded in front of a union representative for minor mistakes that went overlooked when made by white employees; (8) he, along with other African Americans, was wrongfully accused by union representatives of insubordination because he was black; (9) a white employee called an African American employee a "porch monkey," and yet union officials took no action upon hearing the slur, *id.* at ¶ 43; (10) he was told by the local union president to stop documenting incidents that occurred at work; (11) he was denied the opportunity to become a "Service Leader," a job bearing increased compensation, even though he was rightfully entitled to it; and (12) he was ultimately terminated on the pretext of "threats and violence in the workplace," *id.* at ¶ 53. Curry alleges that he reported these incidents to SBC managers and local union officials, but his complaints largely fell on deaf ears.

The allegations of the second named plaintiff, Rick Banks, III, are much the same, including complaints about the conduct of manager Akright. Like Curry, Banks worked in SBC's Saginaw, Michigan office from June 2004 to May 2005. He says that Akright failed to accommodate his allergy to bleach by making him work downwind of its odor, she would chastise him for getting up to simply perform his office duties, and she denied him credit for an entire day of work. Banks also

contends that local union officials failed to do anything about his complaints, criticized him for insubordination, and retaliated against him for complaining.

The third named plaintiff, Marie Hillard, is still employed with SBC at its Saginaw office and is a member of Local 4108. She contends that since she began working at SBC's Saginaw office in 2000, she has "experienced racial discrimination and a hostile work environment that both SBC and the Local Union have ignored." *Id.* at ¶ 78. Hillard claims that in 2002 someone wrote the words "Niggers go home" in an SBC stairwell, and SBC management never addressed the incident, although the epithet was eventually removed. *Id.* at ¶ 79. She says she heard an SBC manager refer to a black employee as "Mr. Bo Jangles" across the "manager's communications system," *id.* at ¶ 92, and in August 2005, white SBC employees passed out fliers to a "whites only party" that was held at the local union hall, *id.* at ¶ 93. Hillard also alleges that SBC consistently chose whites for better paying or more desirable positions, such as Service Leaders. When black employees were appointed as Service Leaders, they were disproportionately criticized for making mistakes and quickly demoted.

The plaintiffs specifically seek multiple forms of relief in their complaint. Their prayer includes a request that the Court declare the defendants' conduct to be in violation of 42 U.S.C. § 1981, Title VII, and analogous provisions of state law; award the plaintiffs and class members compensation for the loss of wages and benefits due to racial discrimination in the past and in the future; reinstate the named plaintiffs and others similarly situated and restore lost seniority; award punitive damages, interest, and attorney's fees; enjoin the employer and the local union from engaging in unlawful discriminatory practices in the future; and appoint a monitor to ensure compliance with federal and state civil rights laws.

Discovery has born out many of the plaintiffs' allegations, but considerable doubt remains on the question of whether the racism was truly pervasive or simply a series of isolated incidents. From a formal standpoint, it is undisputed that the official policies of SBC and Local 4108 condemned racist behavior. To at least some extent, however, it appears that these policies have not been observed.

The most egregious incident alleged is certainly the hanging of a noose in the workplace. The evidence shows that on August 24, 2004, a white union steward, Charles Carter, hung a noose above his desk in a public area on the third floor of SBC'c Saginaw office building. However, according to notes taken in connection with an EEOC investigation of the matter, the conduct was the product of an innocent (albeit culturally insensitive) joke. According to the company's investigative report, employees strung a clothesline in the office and used clothes pins and play money to mark their progress of a sales promotion. Sometime around 6:30 p.m., Charles Carter, service leader and union steward, used a length of the line to fashion a hangman's noose to symbolize what would happen to him if he did not meet his sales quota. Several management-level employees saw the noose but failed to take corrective action. Carter allegedly intended to take the noose down when he left for the night, but he became distracted and forgot. At around 6:40 p.m., Raymond Tucker saw the noose (and managers laughing at it) as he was preparing to leave. He was offended and immediately reported it to union steward Travis Ruffin, who was at home at the time. Ruffin in turn reported the noose to chief union steward "Keith XX," who said he would "get on it right away." Br. in Supp., Ex. 4, Union Report at 1. When Tucker returned to work the next morning at 9:30 a.m., the noose had been removed. Keith approached Tucker and told him that, although it was just a joke, local president Billy Martin was "looking into the incident." *Ibid.*

The EEOC investigative notes also confirm that plaintiff Hillard lodged a complaint about the nose on the morning of September 1, 2004. According to the notes, Hillard thought that Cheryl Griggs and Force Scheduler may have seen the noose as well, but she was not sure. Kimil Wiggins, another African American worker, also saw the noose and became "really upset." *Id.* at 2. Hillard and Wiggins reported the noose to union steward Sean Deloney, who took the noose down at 8:15 a.m. Beforehand, however, Kimil had unsuccessfully appealed to SBC manager Lori Ruthruff. The investigative notes read:

> Manager Lori Ruthruff arrived at work at approximately 7:30 and as she walked towards her desk was approached by Kimil at which time Kimil expressed her disgust with the noose. Ruthruff admitted to she didn't understand the severity of the situation and the content in which it was being viewed therefore failing to look at the situation from Kimil's perspective, Ruthruff dismissed Kimil by saying that Chuck was joking around. Nonetheless, Ruthruff failed to act on this and once more did not remove the noose.

*Id.* at 3 (mistakes in original). After interviewing seventeen employees, the investigator, Beatriz Oshita, Senior EEOC Consultant to SBC, concluded that there was no racial motive behind the incident, but concluded that Carter and the management team should attend diversity training.

Marie Hillard was still upset, particularly by what she saw as the union's acquiesence, so on November 14, 2004 she and co-worker Cheryl Currie sent a letter to the national union. She also contacted the union local and met with local president Billy Martin. Martin allegedly resisted their request to file a grievance, but eventually a group grievance was filed based on the noose incident, although the allegation fails to mention that event specifically. The charge and union position simply read:

> The Union charges Management with the violation of Article 3, Article 4 and any other related articles or letter of agreement and any violations protected under title VII.
> . . .

> The Union demands that the Company stop discriminating against African American
> workers and stop promoting the destruction of racial harmony which is creating a
> hostile work environment for all workers. The Union further demands that all
> retaliation taken against individuals that came forward cease and those individuals
> be made whole in all respects.

Local 4108 Resp. Br., Ex. H, Hostile Work Grievance.

Martin testified that, prior to the grievance, the local union held a meeting to discuss the noose incident and gauge the employees' sense of the matter. He stated that a flier was posted around the Saginaw facility informing workers that the noose incident would be discussed. Martin testified that the incident "cause[d] a lot of commotion" at the office, and "[m]ost everybody" on the third floor knew about it, even if a lot of folks on the other floors did not. Br. in Supp., Ex. 8, Martin Dep. at 83-84. It is unclear how many people attended the meeting, but Martin stated that he normally gets "30 to 40 people in a Union membership meeting." *Id.* at 85. The plaintiffs believe that Martin had an ulterior motive for filing the group grievance: to obtain information on Mr. Carter's discipline so that Local 4108 could then file a grievance on his behalf to reverse the discipline resulting from the noose incident. There is no evidence, however, that Martin or Local 4108 had an improper motive for filing the group grievance and did not genuinely seek to address the noose incident.

One day after the group grievance was filed, on December 2, 2004, Local 4108's Committee of Equity released a memorandum communicating the results of its own investigation into the noose incident. Supp. Br., Ex. 14, COE Memo. Although the dates do not quite match up, it would appear that this memo actually led to the group grievance:

> After a thorough investigation we find that in the case of the hanging noose there was
> no direct intent on one person or group of people to directly intimidate or
> discriminate. However we feel that such action should be addressed by diversity
> training so that this can be prevented in the future. It is the recommendation of the

> COE that the company initiates a company wide diversity training for all management and union employees. This training should start with the BCS department. In addition it is also the recommendation of the COE that a grievance be filed against management for creating a hostile work environment.

*Ibid.*

In addition to the noose incident, the discovery has support the named plaintiffs' other claims of racial slurs and other forms of harassment. For instance, Nicole Riley stated that a white co-worker, Laicy Youkman, called her a "porch monkey" on March 3, 2005. When Riley told Youkman that she was offended, Youkman later sent an email to several African American employees stating that the term was not considered a racial slur "in her neighborhood." Br. in Supp., Ex. 15, Riley Statement at 1. Stephen Curry testified that he and several other workers heard the slur as well. Youkman eventually was suspended for her conduct, but it is unclear for how long.

In a letter dated November 21, 2005, Hillard wrote a letter to the Michigan Department of Civil Rights describing some other events that had occurred since the noose incident:

> On Wednesday, November 16, 2005, it was brought to my attention that the words "No Niggers" was written on the door coming inside of the SBC building. I proceeded to view this for myself and there it was scrapped on the door.

> After the noose incident (late last year) the racial tension has escalated. One employee was called a "porch monkey." Management and the Union were notified and no response has been received. In another incident, a manager announced "I need a verifier for Kim Garrett [black woman] aka Mr. Bo Jangles" across the managers' communication system. To date, there has not been any response to what was said about her making that statement. More recently, we have experienced racial profiling as any time another black employee approaches to my desk to speak with me my manager rushes over saying, "Break it up" while white employees spend excessive time at one another's desk on leisure material. And now today we have the word *nigger* scrapped on the entry door.

Br. in Supp., Ex. 17, Hillard Letter to MDOCR at 1 (mistakes in original).

With respect to the defacement incident, however, the uncontradicted testimony of Senior Manager Karen Bugeja tends to support the defendants' claim that they effected a quick response. She averred in her affidavit she called for maintenance to cover the writing, and when she returned local president Billy Martin already had painted over it. Bugeja had the door removed, stripped to bare metal, inspected for deeper defacement, and painted afresh. SBC then required employees to undergo more racial diversity training.

The plaintiffs also allege that several African American employees were told that SBC management was watching them closely due to their race; that SBC looks differently upon African American sales representatives; and that they needed to outperform their white counterparts. In support of these allegations, the plaintiffs refer to the statements (handwritten and unsigned) by employees Sean Deloney, Trevis Ruffin, and Raymond Tucker.

Deloney states that on September 21 (the year is not indicated), he was approached by Tucker, who was upset because manager Andre Clark had advised him that since he, Tucker, was a minority, he should not be seen talking with other minorities on the floor. A couple of weeks later, Deloney states that Andre Clark pulled him and Ruffin aside and told them: "You know you guys are being watched more than anyone else since you are black and especially being black males." Br. in Supp., Ex. 19, Deloney Statement at 1. Similarly, Trevis Ruffin states that Clark told him on October 12, 2004 that he was being watched by several managers due to the color of his skin that he had to "conduct [himself] better than the average rep because the company looks at minorities differently." Br. in Supp., Ex. 19, Ruffin Statement at 1. Raymond Taylor made a similar statement: "I was told [by Andre Clark] that since I was a minority and the lady that I'm dating is a minority,

that we should only talk on breaks and lunches, but not on the floor." Br. in Supp., Ex. 19, Taylor Statement at 1.

The plaintiffs also allege that manager Debra Akright serially harassed African American subordinates, including plaintiffs Banks and Curry. For instance, Curry testified that Akright would harass him for performing "TPV verification" slowly, even though he was faster than many of his white counterparts who were not harassed. Moreover, Akrught would "run off" African American workers who were talking together, but would turn a blind eye when it came to whites. Similarly, Curry stated that Akright would pull and push African Americans when they got up from their seats, even for work-related tasks. Akright did not physically harass, or even reprimand, white employees when they left their seats. On May 10, 2005, Akright was disciplined with a Final Written Warning for touching employees.

The plaintiffs also allege that SBC had discriminated against African Americans in terms of job opportunities. The allegations here mainly involve the position of Service Leader. According to the complaint, "[t]he Service Leader position was a three-month job that came with increased compensation and which everyone was supposed to have the opportunity to fill once." Amend. Compl. at ¶ 51. The plaintiffs allege that "SBC rarely appointed an African American employee as a Service Leader." *Id.* at ¶ 98. However, the plaintiffs identify no facts in their brief to substantiate this claim, and the defendants' witnesses thoroughly refute the plaintiffs' contention. The defendants state that 30 African Americans performed in the Service Leader designation building wide in 2003; in 2004, 54 African Americans served in this designation building wide including Ms. Hillard; 37 African Americans performed that duty building wide in 2005; and 33 African Americans performed this designation building wide, including Marie Hillard, in 2006. Bugeja and

other managers also testified that promotion and discipline decisions were "not based upon entirely subjective criteria," but rather were "made according to demonstrated behaviors."  SBC Resp. Br., Ex. D, Bugeja Aff. at ¶ 15.

According to a chart produced by SBC, there were approximately 68 African American workers/union members on the third floor at the time of the relevant events.  It is unclear how many African Americans there were in the whole building, but Billy Martin agreed that there were "more than 40 African American members of the Local Union at the Bay Road facility."  Martin dep. at 54-55.

Curry and Banks also claim that they were terminated on May 13, 2005 for complaining about the discrimination and harassment they experienced.  However, the declaration of Bugeja tends to contradict this:

> 8.  In 2005, Nicole Riley (African American), Laicy Younkman, and Stacy Reinke (Caucasians) made allegations of physical threats and sexual harassment in the workplace against Percy Curry, Rick Banks, Chuck Townsel, Pharrington Maxey (all African Americans).  Naomi Walker (Caucasian) made allegations of sexual harassment in the workplace against Rick Zeitz (Caucasian).  During the investigation, 26 interviews were conducted, most of which I attended.

> 9.  The allegations regarding Curry and Banks were corroborated by witnesses who reported to the interviewers that:

>> a.  Curry entered a woman's cubicle and pressed his erect penis against her arm and later made comments about her being "camel toe."

>> b.  Curry put his hand in the same woman's water and said, "See how my 'pre-cum' tastes."

>> c.  Male employees confirmed that Curry talked about women in the office in a sexual way.

>> d.  Many witnesses confirmed that Curry inappropriately touched women in the office.

e. Stacy Reinke reported and three witnesses confirmed that Curry threatened Stacy Reinke after she made the harassment complaint. They stated that Curry told Reinke that he would "lay her out in the parking lot" and that "the bitch better watch her back."

f. Rick Banks [] showed various employees topless photos of co-worker, Naomi Walker, that were on his cell phone. (Banks does not deny showing the photos to Mary Teck Shaefer, but claimed it was an accident.)

g. An African American male said that Banks looked at female employees in a sexual way.

h. A witness stated Curry and Banks would take out a ruler and talk about their penis size.

i. Witnesses reported that Curry and Banks made comments about women bent over, and would say to each other "wonder how she would look bent over." Another confirmed that Banks and Curry made comments about women's body parts in the office and that would comment on how they wanted to see "so and so bend over the desk."

j. Curry and Banks talked about "anal beads" and that they referred [to] themselves as the "beadmasters." Banks admitted to the beadmasters comments.

10. After the investigation concluded, Curry, Banks, Townsel and Zietz were terminated.

Bugeja Aff. at ¶¶ 8-10.

The plaintiffs contend that these allegations and the supporting evidence establish their right to proceed on behalf of a class consisting of all African American workers at SBC's Saginaw facility who are represented by Local 4108. They insist that the number of African Americans that suffered from the defendants' acts at the Saginaw office is so numerous that joinder would be impracticable; and because the named plaintiffs experienced the same acts of discrimination as the class, the plaintiffs' claims are typical, the questions of law and fact are common, and the named plaintiffs can

fairly and adequately protect the interests of the class. The plaintiffs also contend certification is appropriate under Rule 23(b)(2) because their claims for declaratory and injunctive relief predominate over their claims for damages. The defendants contend that class certification is inappropriate because the claims are largely individualized, numerosity is lacking, and there is tension between the circumstances of the lead plaintiffs and those of the putative class members. In addition, defendant Local 4108 argues that certification is inappropriate as to it because the plaintiffs have failed to identify facts sufficient to sustain a claim. Both defendants assert that certification under Rule 23(b)(2) is unavailable in light of the Sixth Circuit's decision in *Reeb v. Ohio Dep't of Rehab. and Corrections*, 435 F.3d 639 (6th Cir. 2006).

## II.

As an initial matter, Local 4108 contends that the Court should not reach any of the issues for class certification under Rule 23, at least as to it, because the plaintiffs cannot prove any facts that would sustain a cause of action against the union local. This argument is somewhat beside the point, particularly since Local 4108 has not filed a motion to dismiss or for summary judgment. To be sure, Local 4108 is correct that class certification would be inappropriate if the plaintiffs had failed to state a claim or produce facts sufficient to create a jury question, insofar as there would be no action to certify. However, to provoke such a determination, Local 4108 would need to file an appropriate motion under Rule 12 or 56. Since Local 4108 has not done this, the procedural posture of the case does not lend itself to that analysis.

In some cases it is appropriate to entertain a motion to dismiss before deciding a class certification motion, especially when the motion to dismiss is based on a want of jurisdiction. *See Hoving v. Transnation Title Ins. Co.*, 545 F. Supp. 2d 662, 265-68 (E.D. Mich. 2008). In addition,

the Court can and should look beyond the pleadings in analyzing a motion for class certification, but only to the extent that it is necessary to conduct the Rule 23 analysis. Whatever the merit of the union's underlying assertion, there is no basis at present for making the sort of merits-based determination that Local 4108 requests. Local 4108 has cited no authority to support this particular argument in opposition to class certification.

III.

According to Federal Rule of Civil Procedure 23, a matter may proceed as a class action in the name of representative parties if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law and fact common to the class; (3) the claims and defenses of the representative parties are typical of the claims and defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997) (citing Fed. R. Civ. P. 23(a)); *Olden v. LaFarge Corp.*, 203 F.R.D. 254, 268 (E.D. Mich. 2001), *aff'd* 383 F.3d 495 (6th Cir. 2004). These factors are normally referred to as numerosity, commonality, typicality, and adequacy of representation.

A class must meet all of the above prerequisites plus one of those listed in Federal Rule of Civil Procedure 23(b) to be certified. *Amchem Prods., Inc.*, 521 U.S. at 614; *Sprague v. General Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998). The movant bears the burden of establishing that all prerequisites for class certification are satisfied. *Thompson v. County of Medina*, 29 F.3d 238, 241 (6th Cir. 1994).

When reviewing a motion for class certification, the Court must conduct a "rigorous analysis" of the requirements of Rule 23. *Sprague*, 133 F.3d at 397 (quoting *General Telephone Co. of the Southwest v. Falcon*, 457 U.S. 147, 161 (1982)). The Court is not bound to accept the

allegations on the face of the complaint as true, and should probe further into the facts where necessary to determine whether these requirements have been met. *Weathers v. Peters Realty Corp.*, 499 F.2d 1197, 1200 (6th Cir. 1974) ("[O]rdinarily, the determination should be predicated on more information than the pleadings will provide."); *Szabo v. Bridgeport Mach., Inc.*, 249 F.3d 672, 675 (7th Cir. 2001) ("The proposition that a district judge must accept all of the complaint's allegations when deciding whether to certify a class cannot be found in Rule 23 and has nothing to recommend it.").

## A.

Turning first to the requirements of Rule 23(a), the plaintiffs posit that there are at least sixty-eight African American union members on the third floor of SBC's Saginaw facility alone, so the numerosity element is easily satisfied. The defendants contest this claim on the ground that the plaintiffs have recited only the maximum number of African Americans that *could* meet the class definition without establishing that each class member suffered the alleged harm common to the named plaintiffs, in that the evidence shows that only five people saw the noose; there has been no showing as to how many African Americans saw the defaced door; there is no evidence that anyone other than Hillard heard the term "Bojangles"; only a "few employees" heard the term "porch monkey"; the plaintiffs have not established the number of African American employees that were harassed by Akright; and the plaintiffs have not shown how many African Americans applied for and were denied the service leader position.

The numerosity requirement is satisfied when "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Although this is not a strict numerical test, "'substantial' numbers usually satisfy the numerosity requirement." *Daffin v. Ford Motor Co.*, 458

F.3d 549, 552 (6th Cir. 2006) (quoting *In re Am. Med. Sys*, 75 F.3d 1069, 1079 (6th Cir. 1996)). The Court "may consider many factors, including 'class size, ease of identification of members of the proposed class . . . geographic dispersion of class members, and whether proposed members of the class will be able to pursue remedies on an individual basis.'" *Beattie v. CenturyTel, Inc.*, 234 F.R.D. 160, 167 (E.D. Mich. 2006) (quoting *Liberty Lincoln Mercury, Inc. v. Ford Marketing Corp.*, 149 F.R.D. 65, 74 (D. N.J. 1995)). In most cases, a class in excess of forty members will do. *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001); *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d. Cir. 1995); *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986). In keeping with the notion that the standard is not strictly numerical, however, there is no need to prove the exact number of class members. "Where the exact size of the class is unknown but general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied." *Orantes-Hernandez v. Smith*, 541 F. Supp. 351, 370 (C.D. Cal. 1982).

Although a close call, the Court finds that the plaintiffs have satisfied the numerosity requirement. The number of people directly exposed to the predicate incidents (e.g., the noose incident, the porch monkey incident, and the defacement incident) is relatively small, and likely would not satisfy the numerosity standard. However, because the plaintiffs seek to proceed on a hostile work environment theory, the analysis requires more depth. The vast majority of the events described above (i.e., everything except for the slur on the door and, perhaps, the allegations concerning the service leader position) occurred on the third floor. The evidence shows that there were some sixty-eight African Americans working on the third floor who were union members at the time. Although the plaintiffs have submitted no evidence on the point, the number of African Americans working throughout the facility was presumably greater. In a hostile work environment

claim, the issue focuses on the nature of the prevailing atmosphere. *See Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999) (explaining that a plaintiff must satisfy the following elements to make out a *prima facie* race-based hostile work environment claim: (1) that he was a member of a protected class; (2) that he was subjected to unwelcome racial harassment; (3) that the harassment was based on race; (4) that the harassment had the effect of unreasonably interfering with the plaintiff's work performance by creating an intimidating, hostile, or offensive work environment; and (5) that the employer was liable for the harassment). Although many African Americans on the third floor may not have seen the noose with their own eyes (or heard the porch monkey slur with their own ears, etc.) it is reasonable to assume – at least at this stage of the proceedings – that they were all affected by it. Indeed, Billy Martin testified that the noose incident caused "quite a commotion" and surmised that everyone on the third floor knew about it. In light of the rule that there is no need to prove exact numbers and the Court may rely on common sense, *see Orantes-Hernandez*, 541 F. Supp. at 370, the Court believes that the numerosity requirement is satisfied.

## B.

Commonality is the second prerequisite for class certification and simply demands that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This provision does not mandate that *all* questions of law and fact raised in the complaint are common. Rather, "Rule 23(a) simply requires *a* common question of law or fact." *Bittinger v. Tecumseh Prods. Co.*, 123 F.3d 877, 884 (6th Cir. 1997). On the other hand, generalized or abstract commonality will not suffice. *See Sprague*, 133 F.3d at 397. "What we are looking for is a common issue the resolution of which will advance the litigation." *Ibid.*

Many of the so-called common questions articulated by the plaintiffs are simply too abstract to meet this requirement. *See* Br. in Supp. at 14 (listing as a common question "whether Defendants discriminated against the class members by fostering or condoning a racial hostile work environment"). However, there are some issues that do fit the bill. For instance, the question whether the hanging of the noose constituted harassment based on race would certainly be common to all members of the class and would advance the litigation. Therefore, this second element is satisfied.

## C.

The third prerequisite for class certification is typicality. Fed. R. Civ. P. 23(a)(3) (providing that "the claims or defenses of the representative parties [must be] typical of the claims or defenses of the class"). A named plaintiff's claim is typical if "it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1082 (6th Cir. 1996) (internal quotation marks omitted). *See also Sprague*, 133 F.3d at 399 (stating that the essence of typicality boils down to the notion that "[a]s goes the claim of the named plaintiff, so go the claims of the class"). Typicality requires that a "'sufficient relationship exist[] between the injury to the named plaintiff and conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct.'" *Stout v. Byrider,* 228 F.3d 709, 717 (6th Cir. 2000) (quoting *Sprague*, 133 F.3d at 399). Although the named plaintiffs' claims must fairly encompass the class members' claims, they need not always involve the same facts or law. *See Sprague*, 133 F.3d at 399; *Senter v. General Motors Corp.* 532 F.2d 511, 525 n.31 (6th Cir. 1976). "The test for typicality, like commonality, is not demanding." *Sprague*, 133 F.3d at 415 (internal quotation marks omitted).

In addition, the Sixth Circuit has explained that the commonality and typicality requirements "'tend to merge.'" *Ball v. Union Carbide Corp.*, 385 F.3d 713, 728 (6th Cir. 2004) (quoting *Rutherford v. City of Cleveland,* 137 F.3d 905, 909 (6th Cir. 1998)). Together they "serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiffs' claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Rutherford,* 137 F.3d at 909.

The defendants in this case correctly observe that plaintiffs Curry and Banks can be distinguished from the vast majority of class members to the extent that they seek relief for retaliatory termination. The plaintiffs have contended in their reply brief that this is not the thrust of their claim, but that seems questionable in light of the emphasis placed on the treatment of these former employees as individuals. However, it is not necessary that the claims of named plaintiffs' *mirror* those of the class members, but simply that they fairly encompass them. *See Sprague*, 133 F.3d at 399.

The essence of the named plaintiffs' claims in this case is that SBC's management personnel acted with racial animus toward them when they created a hostile work environment and took adverse employment action against them by, among other things, denying employment opportunities to them because of their race. They also say the local union turned a deaf ear to them on account of their race when they sought assistance in remedying these abuses. This conduct can be projected upon the class of African-American employees, at least those on the third floor of the SBC facility in Saginaw, since the incidents, people involved, their motivations, and the consequences of their conduct can be said to affect the class members in a way that is similar to the harm alleged by the

named plaintiffs. In conjunction with plaintiff Hillard, who remains an employee for SBC, Curry and Banks meet this standard. The Court finds that the third requirement of Rule 23(a) has been satisfied.

D.

This finding dovetails into the fourth prerequisite for class certification: that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). *See also In re Am. Med. Sys.*, 75 F.3d at 1083. "Adequate representation" invokes two inquiries: (1) whether the class counsel are "qualified, experienced and generally able to conduct the litigation" and (2) whether the named plaintiffs have interests that are "antagonistic" to the other class members. *Stout,* 228 F.3d at 717. "Interests are antagonistic when there is evidence that the representative plaintiffs appear unable to vigorously prosecute the interests of the class." *Id.* at 717. As the Sixth Circuit has noted, "[t]he adequate representation requirement overlaps with the typicality requirement because in the absence of typical claims, the class representative has no incentives to pursue the claims of the other class members." *In re Am. Med. Sys.*, 75 F.3d at 1083.

The Court is satisfied that class counsel are sufficiently competent to handle this matter. In their briefs, they have exhibited a relatively high degree of legal acumen and a command of the facts, and the defendants, in fact, do not appear to contest their skill. On the other hand, the defendants assert that adequacy of representation is lacking because there is a conflict between the lead plaintiffs and some class members. This argument is based on the fact that the named plaintiffs assert claims against Local 4108 and some of the putative class members are union stewards. Thus, the defendants argue, this amounts to a situation where the left hand is suing the right. However, the plaintiffs perry this argument with the assertion that union stewards perform relatively minor

roles, and their beef with the union does not center on the conduct of African American stewards. After studying the pleadings and evidence adduced, the Court agrees with the plaintiffs. The points raised by the defendants do not suffice to show that the claims of the named plaintiffs are "antagonistic" to those of other class members.

E.

Where the plaintiffs fall short in this case is in fulfilling one of the requirements listed in Rule 23(b). *See Amchem Prods., Inc.*, 521 U.S. at 614; *Sprague*, 133 F.3d at 397. According to their assertion in their reply brief, the plaintiffs seek certification only under Rule 23(b)(2). That provision allows class certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Both sides point to *Reeb v. Ohio Dep't of Rehabilitation and Corrections*, 435 F.3d 639 (6th Cir. 2006), as controlling authority, and the defendants rely heavily on this decision for the proposition that a class action seeking monetary damages cannot satisfy the mandate of Rule 23(b)(2) as a matter of law because the individualized claims for damages in such a case will predominate over declaratory or injunctive relief, rendering subsection (b)(2) inappropriate. *See Reeb*, 435 F.3d at 651.

In *Reeb*, the Sixth Circuit reversed a district court's order granting class certification under Rule 23(b)(2) in a Title VII sex discrimination case. Central to its decision was its pronouncement that "Title VII cases in which plaintiffs seek individual compensatory damages are not appropriately brought as class actions under Rule 23(b)(2) because such individual claims for money damages will always predominate over requested injunctive and declaratory relief." *Id.* at 641. The plaintiffs in *Reeb* were a group of female corrections officers who alleged that they were subject to a whole host

of discriminatory treatment, including placement in undesirable assignments, diminished leave opportunities, disparate disciplinary treatment, sexual harassment, and retaliation for voicing their complaints. They purported to represent a class of all female employees at a specific corrections institution who were also union members. The complaint sought $2 million in compensatory damages, $3 million in punitive damages, attorneys' fees and costs, and declaratory relief, and was also construed to request a permanent injunction. The district court granted certification under Rule 23(b)(2) based on the belief that certification under that provision is acceptable as long as money damages do not constitute the predominate relief sought. The court of appeals disagreed.

The court first confirmed that class certification under Rule 23(b)(2) is "not intended to 'extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages.'" *Reeb*, 435 F.3d at 646 (quoting Advisory Committee Note to Fed. R. Civ. P. 23). Then, after acknowledging that the "Supreme Court has never determined whether subdivision (b)(2) classes can be certified in cases in which, in addition to an injunction, the plaintiffs seek monetary relief," *ibid.*, the court went on to examine other circuits' treatment of the question when the relief of money damages can be considered to predominate. The court found most instructive the Fifth Circuit's holding in *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402 (5th Cir. 1998), where the court found that "monetary relief predominates in (b)(2) class actions unless it is incidental to requested injunctive or declaratory relief." *Id.* at 415. The Fifth Circuit interpreted "incidental" to mean "damages that flow directly from liability to the class *as a whole* on the claims forming the basis of the injunctive or declaratory relief, as the text of subdivision (b)(2) refers to 'relief appropriate with respect to the class as a whole.'" *Reeb*, 435 F.3d at 647 (internal quotation marks omitted). The *Reeb* court then elaborated:

To be more specific, the court stated that damages in these cases should be "concomitant with, not merely consequential to, class-wide injunctive or declaratory relief" and that the computation of such damages should not be "dependent in any significant way on the intangible, subjective differences of each class member's circumstances." *Id.* at 415. Damages recoverable would be those that inure to the group benefit, which the court felt was most consistent with the purpose of the (b)(2) class to begin with. *Id.*

*Reeb*, 435 F.3d at 647-48.

The *Reeb* court also relied heavily on its own decision in *Coleman v. GMAC*, 296 F.3d 443 (6th Cir. 2002), in which the court "stated that Equal Credit Opportunity Act (ECOA) plaintiffs seeking compensatory damages cannot seek class certification under subdivision (b)(2) because the request for such damages necessarily predominates over any requested injunctive or declaratory relief." *Reeb*, 435 F.3d at 643; *see also id.* at 649-50. In arriving at this decision, the *Coleman* court observed that while "'there is an apparent consensus that money damages are recoverable to some extent in a Rule 23(b)(2) class action,'" "the Supreme Court has expressed concern about the constitutionality of certifying a mandatory class where claims for money damages were involved." *Reeb*, 435 F.3d at 649 (quoting *Coleman*, 296 F.3d at 447). The court then concluded that the case for precluding Rule 23(b)(2) certification in Title VII cases was even more compelling than in the ECOA case discussed in *Coleman*. The court reasoned that in Title VII cases, not only must the matter of compensatory damages be analyzed on an individual basis, but a court also must assess "whether the discriminatory practice actually was responsible for the individual class member's harm, the applicability of nondiscriminatory reasons for the action, showings of pretext, and any affirmative defense . . . on an individual basis." *Id.* at 651.

The court then concluded:

Accordingly, we hold that, because of the individualized nature of damages calculations for Title VII plaintiffs and the ability of those plaintiffs to bring

individual actions, the claims for individual compensatory damages of members of a Title VII class necessarily predominate over requested declaratory or injunctive relief, and individual compensatory damages are not recoverable by a Rule 23(b)(2) class. . . . We emphasize, however, that this holding does not foreclose all Title VII class actions. Plaintiffs now have the choice of proceeding under Rule 23(b)(3) in an action for money damages or in an action under Rule 23(b)(2) for declaratory or injunctive relief alone or in conjunction with compensatory and punitive damages that inure to the group benefit. And, as always, plaintiffs remain free to bring Title VII actions as individuals.

*Id.* at 650-651.

The Court believes that the holding in *Reeb*, whose facts are remarkably similar to the present matter, must dictate the result in this case. The plaintiffs insist that their claim for damages can be considered "incidental" to the equitable relief they seek, especially in light of the willingness of the named plaintiffs to withdraw their individual damages claims. However, the Court does not see how mere elimination of the lead plaintiffs' individual claims for damages would render the remaining claims for compensatory and punitive damages subordinate to the requests for declaratory and injunctive relief. The claims for damages would still predominate due to the individualized analysis that would be required to determine whether each class member was subjected to racial discrimination or a hostile work environment and, if so, the amount of damages due. With respect to the disperate treatment claims, there are individualized assessments required to determine the nature of the adverse employment action as to the individual class members, and, as the *Reeb* court noted, other questions relating to legitimate reasons for that treatment, pretext, and the applicability of affirmative defenses.

The Sixth Circuit's sweeping pronouncement that class certification under Rule 23(b)(2) in Title VII cases is not appropriate because "individual claims for money damages will *always* predominate over requested injunctive and declaratory relief," *id.* at 641 (emphasis added), leaves

little room for exceptions. The nature of the claims brought by the individual named plaintiffs do not fall within any exception that a fair reading of *Reeb* might allow. Therefore, the Court must deny the motion to certify this matter as a class action.

IV.

The Court finds that the plaintiffs likely meet the requirements of Federal Rule of Civil Procedure 23(a) to certify the case as a class action. However, based on controlling Sixth Circuit precedent, the plaintiffs fail to satisfy the requirements of Rule 23(b)(2), to which they have limited themselves in seeking class action status.

Accordingly, it is **ORDERED** that the plaintiffs' motion for class certification [dkt #76] is **DENIED**.

It is further **ORDERED** that counsel for the parties shall appear at a status conference to discuss further case management deadlines on **August 20, 2008** at **2:30 p.m.**

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: June 23, 2008

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on June 23, 2008.

s/Felicia M. Moses
FELICIA M. MOSES