UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PERCY CURRY, RICK BANKS, III, and
MARIE HILLARD,

                Plaintiffs,

                                      Case Number 06-11728
v.                                     Honorable David M. Lawson

SBC COMMUNICATIONS, INC., a.k.a.
AT&T, Inc.,

                Defendant.
_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs Percy Curry, Rick Banks, III, and Marie Hillard have filed an amended complaint against their employer SBC Communications, Inc., also known as AT&T, Inc., alleging violations of Title VII of the Civil Rights Act of 1964, section 1981 of Title 42 of the United States Code, and the Michigan Elliott-Larsen Civil Rights Act (ELCRA) based on disparate treatment on account of their race, retaliation, and a hostile work environment. The plaintiffs earlier filed a motion to certify their case as a class action, which the Court denied. The defendants now have filed a motion for summary judgment. The motion is opposed and fully briefed. The Court heard oral argument from the parties in open court on May 19, 2009. For the reasons fully explained below, the Court finds that the plaintiffs have failed to establish a jury-submissible claim on their disparate treatment and retaliation theories, but fact questions preclude summary judgment on their hostile work environment theory. Therefore, the Court will grant in part and deny in part the defendant's motion for summary judgment.

I. Facts

SBC Communications, Inc., also known as AT&T, Inc., claims to be the largest telecommunications company in the United States. During the times relevant to this lawsuit, it operated a call center in a multistory building in Saginaw, Michigan. Plaintiffs Percy Curry and Rick Banks began working for the defendant as sales service specialists on June 1, 2004. It appears that a sales service specialist dealt with customers who wished to purchase and operate 800 telephone numbers. Marie Hillard has worked for the defendant since June 5, 2000 as a service representative, a position in which the employee helps customers establish and maintain 800 numbers and digital subscriber lines (DSL).

Curry, Banks, and Hillard each are African-American, and they worked in AT&T's small business division on the third floor of the defendant's building in Saginaw. Hillard still works there, but Curry and Banks were terminated on May 13, 2005. In their amended complaint, they each complain that they suffered adverse employment action because of their race and they were subjected to a racially hostile work environment. Curry and Banks allege that when they complained about racially motivated conduct by their supervisor, the defendant retaliated against them. During their employment, the plaintiffs were members of the Communications Workers of America Local 4108. The union was named as a defendant, but the Court dismissed it with prejudice pursuant to the parties' stipulation. The plaintiffs originally sought to certify the case as a class action. The Court denied the motion to certify. *See Curry v. SBC Communications, Inc.*, 250 F.R.D. 301 (E.D. Mich. 2008).

Curry alleges that he was subject to a number of discriminatory actions and treated differently than white employees. He says that: (1) he was criticized for working too slowly when

-2-

many white employees worked more slowly than he; (2) he was not allowed to keep a pet fish at his desk, but a white employee was permitted to do so; (3) a union official hung a noose in front of the SBC elevator banks and company officials allowed  it to remain there for over fourteen hours; (4) he was reprimanded for speaking with other African American employees when white employees were able to speak with one another with impunity; (5) he was physically grabbed and forced back to his chair by one of his managers, Debra Akright, on numerous occasions; (6) he was separated from white employees and placed with African American employees near Akright's office for monitoring purposes; (7) he was reprimanded in front of a union representative for minor mistakes that went overlooked when made by white employees; (8) he, along with other African Americans, was wrongfully accused by union representatives of insubordination because he was African American; (9) a white employee called an African American employee a "porch monkey," but union officials took no action upon hearing the slur; (10) he was told by the local union president to stop documenting incidents of alleged discrimination that occurred at work; (11) he was denied the opportunity to become a "Service Leader," a job carrying increased compensation, even though he was rightfully entitled to it; and (12) he was ultimately terminated on the pretext of "threats and violence in the workplace."

Banks's allegations are much the same, including complaints about the conduct of manager Akright.  In addition, Banks alleges that Akright failed to accommodate his allergy to bleach by making him work downwind of its odor, chastised him for getting up to simply perform his office duties, and denied him credit for an entire day of work.

Marie Hillard contends that she has been deprived of serving as a service leader, which is a rotating position assigned to sales people that carries with it a pay enhancement.  She also says that

she witnessed racially hostile conduct by coworkers and management, including the noose incident, graffiti scrawled on a stairway door with the words "Niggers go home," racially derogatory remarks by coworkers that went unpunished by management, and white supremacist literature left in a common area on the third floor.

The parties have completed extensive discovery. They offer the following facts from the record.

### A.  Hostile work environment facts

The plaintiffs contend that the defendant has engaged in a pattern of racially hostile conduct that began before Curry and Banks were hired. Hillard worked at the Saginaw office during the entire period and witnessed much of the conduct described below.

### 1.  Noose incident

Hillard was hired on June 5, 2000. Curry and Banks were hired on June 1, 2004. On August 31, 2004, a clothesline was hung in the office by managers John Racine and Nora Goodell at around 5:30 p.m. The clothesline allegedly was intended to display the relative sales progress of different sales teams. A short time later – sometime before 6:30 p.m. – Charles Carter (service leader and union steward) took a scrap piece of the clothesline and fashioned it into a noose above his desk. He brought it to the attention of Karen Bugeja (a supervisor), stating that he would have to kill himself because his sales numbers were down. Bugeja and Racine joked that the noose was not long enough for them to hang themselves. Bugeja testified that she thought of it as a joke and at the time did not see anything offensive about it.

Not everyone thought it was a harmless joke, however. Ray Tucker, a service representative, saw the noose at 6:40 p.m. and reported it to union steward Travis Ruffin, who in turn contacted

-4-

"Keith XX," chief union steward, who promised he would "get on it right away."  Pl.'s Resp., Ex.
E (internal investigation).  Area managers Andre Clark, who is African American, and Lori Ruthruff,
who is white, were asked to take the noose down at some point but did not do so.  Although Carter
indicated that he intended to remove the noose before he left, the defendant's personnel allowed it
to remain up overnight.

Hillard was one of the first people in the office at seven in the morning the next day and was
upset by the noose.  She interpreted it to "depict[] African-Americans that's been hung by a noose
just because of the color of their skin."  Def.'s Mot., Ex. D, Hillard Dep. at 118.  She asked Sean
Deloney, a union representative, to take it down, and he did so around 8 a.m.  Curry and Banks said
they saw the noose while Deloney took it down.  Later that day, Hillard and Curry filed separate
complaints with the defendant's EEOC officer based on the incident, and Banks lodged a complaint
with the union.  Bugeja testified that she did not know which individuals complained about the
noose.

Carter received a final written disciplinary warning for hanging the noose; Clark, Racine,
and Ruthruff received final written warnings and were docked three days pay.  Bugeja received a
written warning for "inappropriate judgment, basically, leadership," and was docked five days pay.
Def.'s Mot., Ex. H, Bugeja Dep. at 50.  Bugeja stated that in response to the noose incident, "AT&T
required all management and non-management employees to attend diversity training, which was
held on December 7 and 8, 2004."  Def.'s Mot., Ex. F, Bugeja Decl. ¶ 7.  However, Bugeja testified
in her deposition that she "was out of the office on medical leave" during the training, so she "was
not present while that training took place," although she verified that it did take place for others.
Pl.'s Resp., Ex. D, Bugeja Dep. at 81; see also Ex. G, Martin Dep. at 135 (union president did not

attend training).  There was a second part to the training intended for a date in December that was

not given, but it was conducted the next year following a later incident.  Hillard testified that she was

told the second part was not given in December "because of lack of participation."  Pl.'s Resp., Ex.

C, Hillard Dep. at 311.

### 2.  Racial remarks

On March 3, 2005, employee Laicy Younkman, who is white, had a conversation with

coworker Nicole Riley, who is African American.  Riley told Younkman that she was just going to

hang out after work.  Younkman then stated something to the effect that Riley would be a "porch

monkey."  This conversation was overheard by Curry and Banks.  Younkman later apologized and

explained that she did not perceive the statement to be a racial slur.  Younkman was suspended for

five days.  Bugeja testified that only Riley complained about the incident to her; however, Curry

testified that he "think[s]'" he reported the incident to the defendant's internal complaint line.  Pl.'s

Resp., Ex. A, Curry Dep. at 134.  Following her suspension, Younkman stated to Banks that "two

can play at this game."  Pl.'s Resp., Ex. M, Banks Decl. ¶ 6.

On June 27, 2005, Hillard overheard Kathy Mielke saying something over the managers'

communication system in reference to employee Kim Garrett.  Hillard testified that Garrett was

referred to as "a.k.a. Mr. Bojangles."  Pl.'s Resp., Ex. C, Hillard Dep. at 78-79.  Hillard informed

Bugeja of this incident in November 2005, during Bugeja's investigation of an incident in which a

racial slur was scrawled on a door, described next.  Hillard asked Mielke about it, and Mielke stated

that she did not make the statement.  Instead, Mielke informed Bugeja that the managers had a

nickname for Garrett – "Cuckoo" – and for each other – "Boo-Boo" and "Beau-Beau" – and that

Hillard must have misheard one of those names.  Pl.'s Resp., Ex. D, Bugeja Dep. at 54.  Bugeja

testified that based on this "very logical explanation," no disciplinary action was taken.  *Id.* at 55.

### 3.  Racial graffiti

On November 16, 2005, coworker Pharrington Maxey informed Hillard of a racial epithet

(Hillard testified that it said "no niggers," while union president Bill Martin testified that it said

"nigg" only, Pl.'s Resp., Ex. G, Martin Dep. at 137) that was "scratched" on the door on the west

side of the building.  Def.'s Mot., Ex. C, Hillard Dep. at 140.  Hillard informed Bugeja, who called

the maintenance department but was not able to reach anyone.  Bugeja then returned to the door to

cover the painting.  In an e-mail submitted by the plaintiff, Bugeja claims that ten minutes elapsed

between Hillard's complaint and Bugeja heading down to the door to paint over it herself.  *See* Pl.'s

resp., Ex. H.  However, union president Martin was already painting the door.  He had received a

call from a union steward indicating that there was a racial slur on a door, so he headed to the office,

saw the slur, went to an auto parts store to buy spray paint, and returned to paint the door.

According to Martin, the epithet had been on the door for a number of years but had been covered

by a sign that recently had been removed in anticipation of a plan to paint the door.

Following this incident, the union filed a group grievance and "asked that additional training

be given" based on this incident and the "porch monkey" comment.  Pl.'s Resp., Ex. G, Martin dep.

at 135.  The defendant obliged and required employees to complete the diversity training that had

been started in December of 2004.

4.  White supremacy flyer

On August 4, 2008, coworker April Banks brought to the attention of Hillard a flyer that had been found in the lunchroom.  The flyer is entitled "I am Proud To Be White; Someone finally said it."  Pl.'s Resp., Ex. L.  The flyer states in part:

There are African Americans,
Mexican Americans,
Asian Americans, Arab Americans,
Native Americans, etc.
. . . And then there are just - Americans.

You pass me on the street
and sneer in my direction.
You Call me 'White boy,'
'Cracker,' 'Honkey,'
'Whitey' 'Caveman,'
. . . And that's OK.

But when I call you Nigger,
Kike, Towel head,
Sand-nigger, Camel Jockey,
Beaner, Gook, or, Chink,
. . . You call me a racist.

You say that whites commit a lot
of violence against you,
so why are the ghettos the most
dangerous places to live?
. . .
If we had a White Pride Day
...You would call us racists.
. . .
You are proud to be black,
brown, yellow and red,
and you're not afraid to announce it.
But when we announce our white pride
. . . You call us racists!

You rob us,
carjack us,
and shoot at us.

-8-

> But, when a white police officer
> shoots a black gang member
> or beats up a black drug-dealer
> who is running from the LAW and
> posing a threat to ALL of society
> . . . You call him a racist.
>
> I am proud.
> . . . But, you call me a racist.
>
> Why is it that only
> whites
> can be racists?

*Ibid.* Hillard went to the lunchroom and found additional flyers in a trash can. She picked them out and went to see manager Jeanne Kline. Kline contacted the EEOC officer, who conducted an investigation.

On August 8, 2008, the union sent a letter to all employees, stating that an "intolerable" incident had occurred. *Ibid.* The letter states that the union recommends that management review the code of business conduct policy with all employees, provide diversity training, provide diversity education once a year, and document attendance at the diversity training. The letter also requests anyone with information about the incident to contact the union. Kline stated that she sent an e-mail to all employees reminding them of company policy; however, Hillard denies ever receiving "any written communication from AT&T." Pl.'s Resp., Ex. J, Hillard Decl. ¶ 6.

### C. Disparate treatment claims

#### 1. Service leader issue

The defendant has a rotating position known as "Service Leader," where employees "perform[] special job functions, such as helping other employees or doing a special project." Def.'s Mot., Ex. F, Bugeja Decl. ¶ 2. An employee who is a service leader is paid an extra fourteen dollars

-9-

per day.  In 2003, Hillard was interested in the position, and asked her manager Lori Ruthruff about it.  Ruthruff promised to look into it, but Hillard served as a service leader on only one occasion. Hillard complains that "white employees with less seniority were given information about service leading, they were service leading when African-American employees weren't even told about the service leader list without inquiring about the list and how to get on it."  Pl.'s Resp., Ex. C, Hillard Dep. at 49.  Hillard further states that she "should have been permitted to be a Service Leader at the rate of approximately ten days per month," Pl.'s Resp., Ex. J, Hillard Decl. ¶ 10, but does not explain how she reaches that conclusion.  Although Curry alleges in the amended complaint that he too was wrongfully deprived of time as service leader, Am. Compl. ¶ 51, the plaintiffs' response to the motion for summary judgment makes no mention of this allegation.

### 2.  Other complaints by Hillard

The plaintiffs testified about the disparate treatment they witnessed in the office.  At some point prior to 2004, Hillard complained to Lori Ruthruff, her boss, that someone was giving "hot leads" to Kelly Holiday, a white employee, which gave her an unfair competitive advantage in sales. Pl.'s Resp., Ex. C, Hillard Dep. at 31-32.  An unknown amount of time later, Hillard was reprimanded based on an allegation that Holiday had been threatened by Hillard.  *Id.* at 28-29. Hillard denies making any threats, and complains that she was never informed what the specific threat was and management failed to ask any questions or undertake an investigation of any sort.

Hillard complains of two additional incidents.  In 2000, Hillard's manager, Nora Goodall-Bishop, who is white, told Hillard that she "looked like a French maid."  Pl.'s Resp., Ex. C, Hillard Dep. at 76.  Hillard believed that this was discriminatory because "[i]t's assuming that I'm a maid,

-10-

a housekeeper, someone cleaning someone's home. . . ." *Id.* at 77.  She says she mentioned it to a union steward but did not make a formal complaint.

In 2005, Hillard was speaking with three African-American coworkers, when Goodall-Bishop, stated "this looks like trouble." *Id.* at 71.  Hillard interpreted this to be based on race: "She was just assuming because we were black that we were up to something." *Id.* at 74.  Hillard did not file a grievance or report the statement to the company's EEOC officer.

In September 2006, Hillard was suspended for six days based on suspected fraud.  However, the union grieved the incident and it was reduced to a written warning, and she was compensated for her missed work.  This is not mentioned in the plaintiffs' response to summary judgment, and apparently is not a basis for their case.

The defendant points out that Hillard currently runs a website at http://www.wakeupblackpeople.com.  One of the pages is a list of the "Top ten things African Americans should not do in the Workplace." Def.'s Mot., Ex. R.  It advises against "Running to the elevator yelling 'hold de do! Hold de dor!'" and "Give a back-rub to a white woman in the workplace."  Hillard testified that she does not believe this to be offensive to African Americans.

### 3.  Banks's and Curry's supervisor's conduct

Both Banks and Curry testified that they were asked by their supervisor, Debra Akright (who is white) to move more quickly with their work, while Akright did not say anything to white employees who were working more slowly.  Moreover, all three plaintiffs complained that Akright would "run off" African American workers who were talking together but would turn a blind eye

when it came to white workers.  Def.'s Mot., Ex. B, Banks Dep. at 39; Pl.'s Resp., Ex. C, Hillard Dep. at 94.

Banks testified that Akright sometimes would set production numbers for the employees, even though this was not an approved practice.  On one instance, date unknown, Akright took a stack of call sheets after Banks had completed them, stating that he wouldn't "get credit for that because it's too easy."  Pl.'s Resp., Ex. B, Banks Dep. at 54.  Akright then distributed the sheets to other workers for them to receive credit.  Three or four times Akright told Curry that he was not allowed to assist other employees, although white employees were allowed to help one another.  Curry also claims that he was asked to take home a small aquarium that he had on his desk because the water posed a hazard, but a white employee had a plastic cup of water with a fish in it and was never asked to take it home.

Akright also would physically pull and push Curry and Banks when they got up from their seats, even for work-related tasks.  *See* Def.'s Mot., Ex. A, Curry Dep. at 36 ("She would either grab me by my hand, she would grab me by my arm before and hoisted my arm up, she has pushed me in my back."); Ex. B, Banks Dep. at 161 ("She put [her hands] on my lower back and she started pushing me.").  On the other hand, Akright did not physically harass – or even reprimand – white employees when they left their seats.  Def.'s Mot., Ex. A, Curry Dep. at 66.  Curry and Banks complained to supervisor Vitrina Johnson and eventually were interviewed by Karen Bugeja about the incidents.  The plaintiffs did not indicate to Bugeja that they perceived Akright's physical contact with them to be race-based.  On May 10, 2005, Akright received a final written warning for touching employees.  Bugeja states that "[m]any" employees, both black and white, complained

-12-

about Akright's behavior.  Def.'s Mot., Ex. F, Bugeja Decl. ¶ 5.  Akright was informed not to retaliate against anybody for the complaints lodged against her.

In early September 2004, Akright rearranged the seating of the office to place Banks, Curry, Chuck Townsel, and Kyle Jewel next to each other near Akright's office.  The plaintiffs believe that they were put close to Akright so that she could "monitor" them.  Pl.'s Resp., Ex. A, Curry Dep. at 271.  They complained to Bugeja, and they were moved away from Akright's office.

Curry testified that Akright had a "coaching" session with him about a mistake he had made on a job task in October or November of 2004.  Pl.'s Resp., Ex. A, Curry Dep. at 117.  According to Curry, coaching is "in a sense a corrective action," where the manager "talk[s] to you about . . . a mistake you made," and informs the employee that future mistakes can lead to disciplinary actions. *Id.* at 76.  His coworkers Younkman and Brian Niemiec, who were white, told him that they had made similar mistakes but had not been reprimanded.  He believes that the only other person who had been similarly reprimanded was Banks.

On November 3, 2004, Banks was verbally reprimanded by Akright when he called then-President Bush an "idiot," "but [Akright] said nothing when Kyle Jewel (Caucasian) referred to Senator Kerry as a 'bastard' in her presence."  Pl.'s Resp., Ex. M, Banks Decl. ¶ 4.

On December 31, 2004, Curry was assigned to call customers to reschedule appointments. However, because it was New Years Eve, he was having difficulty reaching anyone and had low numbers. The following Monday, Akright gave Curry a verbal warning for low numbers.  Curry felt that this was unfair because Younkman and John Bollman had lower numbers than Curry on New Years Eve.  He appealed the decision to Lorraine McMillan, who was acting area manager in

-13-

Bugeja's absence.  McMillan removed the verbal warning after Akright admitted that other individuals with lower numbers were not given warnings.

Banks liked to listen to rap music in his cubicle, but in early January of 2005, Akright required him to stop because she thought it was too loud.  Banks attributes the directive to the fact that Akright "was a Christian lady, [so] she'd probably think [listening to Banks's music is] a sin or something."  Def.'s Mot., Ex. B, Banks Dep. at 62.  However, according to Banks, other employees on the floor were permitted to listen to music, including rap music, at louder volumes.  Banks complained to Bugeja, who told Akright that she could not take Banks's radio unless she took the radio of every employee.

In March 2005, Akright told Curry that he needed to stop documenting incidents of racial discrimination.  *See* Pl.'s Resp., Ex. N, Curry Decl. ¶ 5.  Banks claims that at the same time, both Akright and Bugeja told him that he had to stop documenting these incidents.  *See* Pl.'s Resp., Ex. M, Banks Decl. ¶ 5.  Bugeja testified that she said their practice was fine as long as it was done on break time and not work time.

Banks also complains that he was blamed when several employees teased a coworker who brought in taco salad that had a hair in it (date unknown).  He claims that he was not teasing the coworker, and Akright was informed by a witness that Banks was not involved.  Nevertheless, Akright had Banks and the two individuals who were involved were coached about the incident.

### D.  Termination of Banks and Curry

In the spring of 2005, management received complaints from workers of sexual harassment and inappropriate conduct by coworkers.  The complaining persons were Laicy Younkman (white),

-14-

Nicole Riley (African American), and Stacey Reinke (white); and the objects of their complaints were Curry, Banks, Chuck Townsel, Pharrington Maxey (all African American), and Rick Zietz (white). The defendant conducted an investigation, which included over two dozen interviews, mostly conducted by Karen Bugeja. The complaints centered around unwelcome sexual comments, and in a few instances provocative touching, made by workers. In addition, Banks came into possession of a topless photograph of a female coworker, Naomi Walker, which he showed to others in the workplace. The defendant said it relied on the results of the investigation, memorialized in the interview notes, in deciding to terminate Curry and Banks. The following are excerpts from the defendant's investigation, including a summary of witness statements:

> Naomi Walker
> 4/14/05
> Another issue about a picture of Naomi on a cell phone. Naomi said she didn't want to come forward. I was drunk at a party and someone got a hold of the picture that was on my cell phone. She said she was passed out at the party and someone got a hold of this nude picture of her.
>
> Karen asked did you show the picture to anyone. Naomi said she didn't show it to anyone. She said she didn't show the picture on the elevator. Naomi said Rick Banks was showing the picture to employees on his cell phone. She said Rick would come up to her and say why don't you just tell people you sent me the picture. Naomi said the picture is inappropriate to show at work. Naomi said she asked Rick to erase the picture from his cell phone. This photo/drunken party incident happened in December of 2004.
>
> Rick Banks
> 4/14/05
> Asked Rick if he knows Naomi and he said yes. He said they hung out a couple of times. He volunteered to tell us that Naomi bends the truth so he doesn't talk to her anymore. He said they are co-workers and there was no personal relationship.
>
> I asked him about the picture of Naomi on his cell phone. He said, yes he has it, but she sent it to him. He said this happened sometime in October of 2004. He said he took a picture of her topless at her apartment. He said he had not showed it. He remembered showing it to Mary Tack Sheffer. Rick said he was in a car accident and was showing Mary pictures of his accident on his cell phone. He said Mary was

-15-

scrolling through pictures on his cell phone, she came across the picture of Naomi. Rick admitted to have the inappropriate picture on his cell phone in the workplace. He also said Mary did see it in the workplace.  He said he and Naomi don't talk anymore.  He said he did not hear the rumor of Naomi and her name reference.

Stacy Reinke
4/15/05
* * * Stacey said Percy [Curry] would verbally sexually harass certain women in the office. Stacey said Percy got friendly with team members.  She said Percy would get friendly with certain women in the office.  She said she often told Percy to stop it.  She said Percy would touch women in the office and she wanted it to stop.  She said that's when she emailed Lori Martin about a month ago because Stacey wanted Percy to stop.  She said the touching began in June of 2004.  He would come around your torso and grab you and scare you.  She said he was "high school like."  She said he would touch your face, leg and knee cap.  She said she asked him to stop and he did.  She said he said he was sorry.  * * *  She said Rick [Banks] and Percy would talk about their penis size.  She said Rick and Percy would have a ruler and talk about their penis size.  She said Chuck would sit there and laugh.  She said Percy would talk about cheating on his wife and being unfaithful.  She said she told him not to talk about that kind of stuff at work.

Stacey talked about when all the sexual harassment started.  She said it began back in training in June of 2004.  She said Percy sat directly begin [sic] her and Rick was on the side.  She said they would talk about their penis', women's behind and breasts.  She said she told them to stop talking about it. * * *

Stacey said Percy grabbed and touched, but Rick never touched.

Laicy Younkman
4/15/2005
* * * She said two weeks ago Percy [Curry] came up to her while she was on the phone with customers.  She said he came into her cube.  She said he pressed his erected penis against her arm.  She said she pushed him away.  She said she didn't know any of the witnesses.  She said Percy made a comment about her being "camel toe." * * *

Laicy said Rick [Banks] and Percy made comments about girls in the office.  She said they would make comments about girls bent over.  She said they would say "wonder how she would like bent over."  She said she made a complaint to her coach, Deb Akright and to HR. * * *

Laicy talked about additional comments made by Percy.  She said he would ask her to touch him down there "pre-cum" to see how it tasted.  He put his hand in her water and said see how my "pre-cum" tastes.  Laicy said Chuck [Zietz] may have heard.

-16-

Asked Laicy about the threat allegedly made by Percy. Laicy said [she] and Stacey [Reinke] are friends. She said he would "lay her out in the parking lot." Laicy said the threat was made on the elevator. Those on the elevator were Rick, Chuck, Percy, and Nicole. Laicy said Rick Banks shares all his weekend sex escapades with everyone in the center. She said Rick has not touched her.

Nicole Riley
4/14/2005
* * * Nicole said she was on the elevator about three weeks ago with Percy Curry, Rick Banks. She said Percy said "the bitch better watch her back." She said to them "Stacey is cool, she made no complaints. She said the two men started to laugh.
* * * She said she heard Percy, Rick and Mark Epps talked about "anal beads." She said they referred to themselves as the "beadmasters."

Mary Tack Sheffer
4/18/2005
* * * She said she did see the nude picture of Naomi Walker on Rick Banks['] cell phone. She said she was viewing car accident pictures on Rick's phone when she flipped to the picture. She said this happened in January of 2005 or December of 2004. * * * She said he didn't purposely mean to show her the pictures. * * *

* * * She said Percy [Curry] and Stacey [Reinke] were having a discussion in the workplace when they began to argue. She said she heard Percy say to her "nothing will happen here, but once you're on the streets is a different story." She said this comment was made in November of 2004. * * *

Mary said Stacey told her the argument was about Percy and Chuck [Zietz] making remarks about homosexuals and women. Mary said Stacey got upset about the remarks. Mary said Stacey heard Percy make fun of John Bollman and his sexuality. * * *
* * * she said she never saw Rick touch employees. Mary said she has heard Rick, Percy and Chuck make comments about women's body parts in the office. Mary said she confronted Rick about his comments in the workplace. She said she told Rick he could get in trouble if anyone heard him. She said he know he could get in trouble. She said Rick made comments about women's body parts in June of 2004 during training. * * *
Rick sat behind Mary during training. * * * Mary said the comments included how the three men wanted to see "so and so bend over the desk." Mary said the comments were all sexual in nature.

Rick Banks
4/26/2005

-17-

I asked Rick about the Mardi Gras beads and the discussion around the beads. He said he remembers the conversation. He said he is not sure how it got started. He said things just escalated. It happened around February of 2005. He said he remembers the comment about "beadmasters." He said it was a joke. He said the following people were involved in the conversation: Rick, Percy [Curry], Mark Epps, Mary Tack Shaffer, Nicole Riley, Renee Cheatham and Lakesha Young. He said Chuck was not involved in the conversation.

* * *

Rick said African American men can't have conversations in the office. He said the women can, but the men can. He said he feels he is being targeted. He said coaches double check his work. Rick claims he receives coaching from Deb Akright, but Laicy doesn't.

Bryan Niemic
4/27/2005
He said Chuck [Zietz], Percy [Curry] and Rick [Banks] would talk about individuals. No specifics. He said you could tell they were checking girls out by their body language. They would stare, gesture as though they were checking someone out.

John Bollman
4/28/2005
I asked John if he recalls witnessing any threats in the center. He said he remembered four or five months ago Stacey [Reinke] and Percy [Curry] got into an argument. Percy said to Stacey "it's one way at work, but different in the parking lot." John said there were no managers present when this was said. John said Percy was always making random sexual comments about women in the office. He said Chuck and Rick would too. No specifics just random sexual comments.

Justin Malone
4/28/2005
I asked him about employees making inappropriate comments in the office. He said he heard Percy [Curry] talking about what some women in the office were wearing. He would talk about how someone was wearing something "too revealing." He said the last time he hear Percy make comments about women in the office was about three to four weeks ago. He said Percy was loud with his laugh. He said anyone could hear.

Cheryl Griggs
4/28/2005
Cheryl then said she recalls when Laicy [Younkman] returned from her suspension, she said "if this is the way they will play the game, they should look out." Cheryl said she heard Laicy said "if I got in trouble, others will pay." Laicy did not use specifics [sic] names about who she would get in trouble, it was just in general,

-18-

> Cheryl said.  Cheryl said took Laicy's comments as anybody who said anything would be in trouble.

Def.'s Mot., Ex. G.  Curry and Banks deny these allegations and filed declarations.  Pl.'s Ans. to Mot., Ex. M & N.  Following the investigation, Curry and Banks, as well as one African American coworker and one white coworker, were terminated.  Def.'s Mot., Ex. F, Bugeja Decl. ¶ 10.  Bugeja states that "Akright was not involved in the investigations of Percy Curry and Rick Banks.  She was likewise not involved in the decision to terminate them."  Def.'s Mot., Ex. I, Bugeja Aff. ¶ 6.

Banks and Curry observe that this same investigation revealed improper conduct by Younkman and Reinke, who are white, yet no disciplinary action was taken against them arising out of the investigation.  During his investigation interview, Banks stated:

> Rick said Laicy and Stacey talked about sex.  He said they talked about "dildos."  No one else, but Laicy and Stacey talked that way at work.  Rick said Laicy and Stacey would call each other "les-boos."  He said they haven't called themselves this nickname in probably two months.

Def.'s Mot., Ex. G.  The investigation notes contain the following information from Cheryl Griggs:

> Karen asked about Stacey or Laicy making sexual comments to each other.  Cheryl said she hasn't heard it in a long time.  Cheryl said Stacey and Laicy would call each other a "special name."  Cheryl said they acted very "high school."  She said Stacey and Laicy don't talk to each other much anymore.

*Ibid.*

### E.  Defendant's motion

In its motion, the defendant attacks each of the plaintiffs' theories of liability.  It argues that 1) there is no direct evidence of discrimination, so the *McDonnell-Douglas* burden-shifting framework applies; 2) Hillard has not shown that she suffered an adverse job action; 3) Hillard, Curry, and Banks have not shown that they were similarly situated to any person outside the protected class; 4) Curry and Banks have not shown that they engaged in protected activity

-19-

regarding their complaints about Debra Akright; 5) Curry and Banks cannot establish causation; 6) Curry and Banks have not shown that the reasons for their discharge was pretextual, and Hillard has not shown that the reasons for her written warning were pretextual; and 7) the plaintiffs' hostile environment claim fails because the conduct was not sufficiently severe and the defendant took remedial action to prevent any harassment.

## II.  Discussion

A motion for summary judgment under Fed. R. Civ. P. 56 presumes the absence of a genuine issue of material fact for trial.  The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (internal quotes omitted).

A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001).  "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000).  An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248). Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000).  When the "record taken as a

-20-

whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 534 (6th Cir. 2002). Thus a factual dispute which "is merely colorable or is not significantly probative" will not defeat a motion for summary judgment which is properly supported. *Kraft v. United States*, 991 F.2d 292, 296 (6th Cir. 1993); *see also Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 772 (6th Cir. 1999).

The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp.*, 477 U.S. at 322-23.

The party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991). "[T]he party opposing the summary judgment motion must 'do more than simply show that there is some "metaphysical doubt

as to the material facts."'" *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th

Cir. 2003) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 800 (6th Cir. 1994), and

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "Thus, the mere

existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there

must be evidence on which the jury could reasonably find for the plaintiff." *Ibid.* (quoting *Anderson*,

477 U.S. at 252) (internal quotation marks omitted).

## A.  Disparate treatment

Title VII forbids an employer "to . . . discharge any individual, or otherwise to discriminate

against any individual with respect to his compensation, terms, conditions, or privileges of

employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.

§ 2000e-2(a)(1).  The Michigan Elliott-Larsen Civil Rights Act forbids like conduct.  Claims of race

discrimination under Title VII and the Michigan counterpart can be analyzed together because

Michigan courts frequently "turn to federal precedent for guidance in reaching [their] decision" to

determine whether a claim has been established in discrimination cases.  *Radtke v. Everett*, 442

Mich. 368, 382, 501 N.W.2d 155, 162 (1993) (quoting *Sumner v. Goodyear Co.*, 427 Mich. 505,

525, 398 N.W.2d 368 (1986)).  For analytical purposes, Michigan's Elliott-Larsen Act resembles

federal law, and the same evidentiary burdens prevail as in Title VII cases.  *See In re Rodriguez*, 487

F.3d 1001, 1008 n.2 (6th Cir. 2007); *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004);

*Lytle v. Malady*, 458 Mich. 153, 172-73, 579 N.W.2d 906, 914 (1998).  Finally, 42 U.S.C. § 1981

prohibits racial discrimination in the making and enforcing of private contracts.  *See* 42 U.S.C. §

1981.  "The elements of [a] prima facie case as well as the allocations of the burden of proof are the

-22-

same for employment claims stemming from Title VII and § 1981." *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573 n.5 (6th Cir. 2000) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993)).

"The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000). All three plaintiffs contend they can establish that they suffered adverse employment action (Banks and Curry for their termination, Hillard based on not getting the service leader position) based on race.

To withstand summary judgment on their disparate treatment claims, the plaintiffs must either "present direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discriminatory treatment." *Johnson v. Kroger Co.*, 319 F.3d 858, 864-65 (6th Cir. 2003). In the absence of direct evidence, the plaintiffs might prevail if they can establish an inferential case of discrimination under the familiar *McDonnell-Douglas* framework.

### 1. Direct evidence case

The plaintiffs state that they "will be able to establish a *prima facie* case of disparate treatment through direct evidence of discrimination . . ." Pl.s' Resp. at 30. However, they fail to develop this point or identify what they believe constitutes this direct evidence. "Direct evidence is that evidence which, if believed, requires no inferences to conclude that unlawful [discrimination] was a motivating factor in the employer's action." *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 543-44 (6th Cir. 2008). "'Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group.'" *In re Rodriguez*, 487 F.3d at 1007 (quoting *Johnson*, 319 F.3d at 865). Direct evidence is a manifestation

-23-

of actual discriminatory intent by a decision maker, "such as an explicit statement" that the employer was acting on the basis of a protected status. *Imwalle*, 515 F.3d at 544.

"Evidence of discrimination is not considered direct evidence unless a[n improper] motivation is explicitly expressed." *Amini v. Oberlin College*, 440 F.3d 350, 359 (6th Cir. 2006). Statements that require an inference to determine discriminatory motivation are not direct evidence. *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 238-39 (6th Cir. 2005) (in gender discrimination case, interview committee member's statement that they wanted a "grass roots guy" was not direct evidence).

In this case, the plaintiffs have not pointed to what they believe constitutes direct evidence of discrimination, and the Court cannot discern any. A review of the record shows no statement "which, if believed, requires no inferences to conclude that unlawful [discrimination] was a motivating factor in the employer's action." *See Imwalle*, 515 F.3d at 543-44. There is no explicit statement by a decision maker that he or she was acting on illegal grounds. The plaintiffs cannot proceed under a direct evidence theory.

### 2. Circumstantial evidence case

To establish an inferential case of disparate treatment based on race, the plaintiffs may proceed under the "the burden-shifting framework first set forth in *McDonnell Douglas v. Green*, 411 U.S. 792, 802-05 (1973)." *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 524 (6th Cir. 2007) (citing *Rowan* [*v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 547 (6th Cir. 2004)]; *Town v. Mich. Bell Tel. Co.*, 455 Mich. 688, 695, 568 N.W.2d 64, 67-68 (1997)). That construct addresses proof of discriminatory intent by circumstantial evidence, and it requires the plaintiff to present a *prima facie* case, whereupon the defendant must offer a legitimate reason for its actions. If the defendant

does so, the plaintiff cannot proceed unless she offers some evidence that the defendant's proffered justification is a pretext for unlawful discrimination. *See Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 342 (6th Cir. 1997).

### a. *Prima facie* case

A plaintiff may establish a *prima facie* case of discrimination "by showing that: '(1) she is a member of a protected group, (2) she was subject to an adverse employment decision, (3) she was qualified for the position, and (4) she was . . . treated differently than similarly situated non-protected employees.'" *Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008) (internal citations omitted). Deprivation of increased compensation qualifies as an adverse employment action. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 403 (6th Cir. 2008).

### i. Adverse action

The parties agree that the plaintiffs were members of a protected group. They must also show that they were subject to adverse employment actions. "An adverse employment action is an action by the employer that 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *White*, 533 F.3d at 402 (quoting *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998)).

Hillard alleges that she was not allowed to serve as a service leader, even though she asked her supervisor to be placed on the list. The service leader position carried extra compensation, and therefore the failure to allow Hillard to act in that capacity can be considered an adverse employment action.

-25-

Curry and Banks were terminated. "An employer's decision to discharge an employee is a classic example of an adverse employment action." *Vincent v. Brewer Co.*, 514 F.3d 489, 495 (6th Cir. 2007). However, Curry and Banks complain about other activity, such as Akright's treatment of them in the workplace, including her practice of pulling and pushing them in their desks. This conduct does not rise to the level of an adverse employment action. In *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006), the Supreme Court interpreted the anti-retaliation provision of Title VII to encompass more injuries than were cognizable in disparate treatment claims. Even under that broader provision, "petty slights, minor annoyances, and simple lack of good manners" do not qualify as adverse action. *Id.* at 68. The fact that Akright pulled the plaintiffs by the arm or pushed them into their chair is undoubtedly rude and inappropriate; but it does not "discriminate . . . with respect to [their] compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a).

### ii.  Similarly situated

The fourth element of the plaintiffs' *prima facie* case is that similarly-situated persons outside the protected class were treated more favorably.  "To satisfy the similarly-situated requirement, a plaintiff must demonstrate that the comparable employee is similar 'in all of the *relevant* aspects.'" *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 412 (6th Cir. 2008) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir.1998) (emphasis in original)); *see also McMillan v. Castro*, 405 F.3d 405, 414 (6th Cir. 2005) ("The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated.'" (citation omitted)).  To be

-26-

"similarly situated," employees generally must "have dealt with the same supervisor" and "have been subject to the same standards." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992).

Marie Hillard has not identified any specific employees outside the protected class that were treated more favorably with respect to the Service Leader assignments. The closest she comes is with her testimony that "white employees with less seniority were given information about service leading, they were service leading when African-American employees weren't even told about the service leader list without inquiring about the list and how to get on it." Pl.'s Resp., Ex. C, Hillard Dep. at 49. However, she has not offered any evidence of who these white employees are, whether the ones with "less seniority" worked in the same job classification, whether they had similar performance numbers, or any other information about them. The record contains nothing more than Hillard's conclusion that white employees were treated differently than her, with no basis to assess the propriety of the alleged comparators. This evidence is insufficient. *See Hartsel v. Keys*, 87 F.3d 795, 801 (6th Cir. 1996) (finding that "bald assertions and conclusory statements fail to provide any factual support" for a claim of disparate treatment based on race). Hillard has not made out a *prima facie* case for disparate treatment.

Nor have Curry or Banks identified any employees who were similarly situated to them and were not terminated. Their argument is slightly different, however. They contend that there were white employees who did other things and were not subject to appropriate discipline, or at least that the discipline was not as severe as that meted out to Banks and Curry. For instance, they point to the fact that Younkman, Mielke, and Carter were not terminated, despite uttering racial slurs or hanging a noose. In *Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495 (6th Cir. 2009), the Sixth Circuit emphasized that an employer may choose to treat different rule violations more or less

-27-

severely without the employees being considered "similarly situated."  In *Ladd*, one employee was found guilty of filing a false injury report and was terminated.  The other employee was found guilty of starting a truck before ascertaining whether it was safe to do so and was not terminated.  The Court held:

> [W]e look to similarly situated employees not to evaluate the employer's business judgment, but to inquire into the employer's "motivation and intent" to determine whether the employer was "motivated by retaliation."  *Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir. 1987).  Even though as outsiders, we may regard safety violations as severe as dishonesty, it is within the company's business judgment to treat differently-situated parties differently.  Without similarly situated parties, we cannot adjudge the intent of the employer as to retaliation.

*Id.* at 503.  The fact that other employees broke other rules – even ones perhaps appearing as serious as the ones with which the plaintiffs were charged – does not aid the plaintiffs in identifying a similarly situated individual.

On the other hand, the plaintiffs suggest that Younkman and Reinke are similarly situated individuals because they too talked about sexual matters in the office but were not discharged.  The evidence does show that complaints were made that Younkman and Reinke would refer to themselves as "les-boos," and there is an allegation made by Banks that they also talked about "dildos."  However, this conduct was not nearly as severe as the conduct of which Banks and Curry were accused.  Curry was accused of making a threat of physical violence against a coworker, and no one has alleged the same against Younkman or Reinke, or anyone else.  Curry also made physical contact with women as part of his harassment; there is no similar allegation against anyone else.  Curry is not similarly situated to Younkman or Reinke.

With Banks, the issue is a bit closer.  However, Banks's conduct of talking about female coworkers' body parts was confirmed by multiple witnesses and was directed towards coworkers

-28-

who did not welcome the comments, where Younkman's discussion of "dildos" was not directed toward any of the male co-workers and her comments about "les-boos" were between herself and her friend. Even if two employees break the same rule, an employer can decide that one's conduct is more severe than the other's. *See Ladd*, 552 F.3d at 503 (citing *Klepsky v. United Parcel Serv., Inc.*, 489 F.3d 264 (6th Cir. 2007), a case discussing pretext); *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006) ("In the disciplinary context, we have held that to be found similarly situated, the plaintiff and his proposed comparator must have engaged in acts of 'comparable seriousness.'" (internal citations and emphasis omitted)). Banks also has failed to establish that he is similarly situated to any white employee who committed an act of sexual harassment of comparable seriousness. The possibility that witnesses may have lied and the plaintiffs were not actually guilty is of no consequence, as long as their story is plausible. The defendant "is not liable if it acted upon an honest belief in its non-discriminatory reason and made a reasonably informed and considered decision." *Ladd*, 552 F.3d at 503 (dismissing argument that all white witnesses lied).

The Court concludes that neither Curry nor Banks has established a *prima facie* case of disparate treatment.

### b. Pretext

Even if Banks and Curry had established a *prima facie* case, the defendant has identified serious misconduct committed by them, and neither has pointed to any fact that would suggest that the decision to terminate them was pretextual. In this Circuit, proof of pretext has been organized around three general propositions: "(1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate his discharge, or (3) that they were *insufficient* to motivate discharge." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)

(quoting *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 513 (7th Cir. 1993)).  Banks and Curry have focused on the first proposition, contending that they did not engage in the acts of which they were accused by their coworkers.  They insist that the defendant's reasons for firing were based on "unsubstantiated allegations,"  Pl.'s Resp. at 30.  The plaintiffs emphasize that "[t]he so called 'witnesses' to these alleged acts cannot provide specific details including the approximate dates of the alleged incidents."  *Ibid.*

The argument is somewhat beside the point.  "[I]n determining if the plaintiffs have raised a genuine issue of material fact as to pretext, [the Court] should consider not whether [the plaintiffs] *actually* breached [the defendant's rules], but rather whether the [defendant] had an honestly held belief that they had committed [a violation of the rules]."  *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 398 (6th Cir. 2008).

> [T]he key inquiry in assessing whether an employer holds such an honest belief is whether the employer made a reasonably informed and considered decision before taking the complained-of action.  An employer has an honest belief in its rationale when it reasonably relied on the particularized facts that were before it at the time the decision was made.  [W]e do not require that the decisional process used by the employer be optimal or that it left no stone unturned.

*Ibid.* (quoting *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598-99 (6th Cir. 2007)).

In this case, the defendant conducted a detailed and thorough investigation; there are records that included numerous witness interviews.  The plaintiffs have raised no hearsay or authentication objections to the defendant's investigation notes, and in fact themselves submitted the notes as an exhibit to their response.  The fact that some of the witnesses were not able to point to exact dates does not mean that the employer was unable to rely on their information, particularly when other details were corroborated (such as the particular comments made by the plaintiffs) and the harassing conduct was ongoing, with the months the harassment commenced identified by some witnesses.

"The response by the plaintiffs failed to produce any evidence indicating that the process the [defendant] used to conduct the investigation was irregular or idiosyncratic." *Allen*, 545 F.3d at 398. Viewing the evidence in the light most favorable to the plaintiffs, the Court has no trouble concluding that the investigation was reasonable as a matter of law. No reasonable juror could conclude otherwise.

In a supplemental brief, the plaintiffs also reference a recent Sixth Circuit decision, *Risch v. Royal Oak Police Dep't*, 581 F.3d 383 (6th Cir. 2009), but that case provides no support for the plaintiffs' position. In *Risch*, the court reversed summary judgment against a female police officer on her Title VII gender-discrimination claim because factual questions existed as to whether the nondiscriminatory reason proffered by the department for its failure to promote the plaintiff was pretextual. The plaintiff was passed over for a promotion in favor of two male applicants who had lower scores than the plaintiff under the promotion system used by the defendant; she also was passed over for a promotion in favor of male officers on five other occasions between 2002 and 2005. The explanation for the male officers' selection was that "the other officers in the eligibility list had better test scores, better performance evaluations and demonstrated more initiative and leadership qualifies, " *id.* at 387; but the police chief in charge of promotion did not consider the plaintiff's seniority, the criterion that lifted her score over the two male officers. In that case, the decision maker also had made remarks demonstrating hostility toward female officers advancing within the department. The facts of *Risch* are so remarkably distinct from the present matter that it is difficult to extract guidance from the decision in the circumstances of this case.

B. Mixed motive claim

In a separate subsection, Title VII provides that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was *a* motivating factor for any employment practice, *even though other factors also motivated the practice*." 42 U.S.C. § 2000e-2(m). Under this statute, an employer whose adverse employment was motivated in part by illegal considerations may not avoid liability altogether, but it may seek to limit damages if it can show that it would have taken the same action despite the plaintiff's protected status. *See* 42 U.S.C. § 2000e-5(g)(2)(B) (prohibiting damages awards and allowing only declaratory relief, injunctive relief, and attorney's fees when the employer proves that it would have taken the same action in the absence of the impermissible motivating factor). A plaintiff may prove a claim under a mixed-motive theory by direct or circumstantial evidence. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 92 (2003). The Sixth Circuit has jettisoned the *McDonnell-Douglas* burden-shifting framework for analyzing circumstantial mixed-motive Title VII cases at the summary judgment stage. *White*, 533 F.3d at 400. In its place, the court has substituted the following test: a plaintiff "need only produce evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) race, color, religion, sex, or national origin was a motivating factor for the defendant's adverse employment action." *Ibid.* (quotation marks and citations omitted). "The ultimate question for the court in making a summary judgment determination in such a case is . . . whether there are any genuine issues of material fact concerning the defendant's motivation for its adverse employment decision, and, if none are present, whether the law – 42 U.S.C. § 2000e-2(m) – supports a judgment in favor of the moving party on the basis of the undisputed facts." *Id.* at 402.

The plaintiffs have not satisfied their burden under a mixed-motive theory. Curry and Banks were fired by Karen Bugeja. They have not provided any evidence from which a reasonable jury could conclude that Bugeja was motivated in any part by the plaintiffs' race. Even assuming that racial animus could be imputed to Bugeja because she did not respond appropriately to the hanging of the noose, under *White*, this is not sufficient. *See White*, 533 F.3d at 404 (finding clear evidence of racial animus on the part of the supervisor, but considering whether there was any evidence that the supervisor acted on this animus). In *White*, the Sixth Circuit considered a plaintiff's supervisor who obviously harbored animus towards African-Americans, because he stated "nobody wants to be around a black man." *White*, 533 F.3d at 404. Notwithstanding this statement, the court demanded some evidence that the supervisor's "racial animus was a motivating factor in his evaluation of White's 2004 job performance." *Ibid.* The court found that evidence in the fact that the supervisor "applied the wrong standard to evaluate his 2004 performance." *Ibid.* There is no comparable evidence in this case.

Rather, the Court takes guidance from *Wright v. Murray Guard, Inc.*, 455 F.3d 702 (6th Cir. 2006), where the Sixth Circuit held that an employee failed to survive summary judgment on the mixed-motive claim of race and sex discrimination. The employer undertook an investigation into charges of sexual harassment, and the employee claimed that the witness had motive to lie and did in fact lie.

> Wright's criticisms of the rigor of Murray Guard's investigation do not create an issue of fact regarding the company's motives because the investigation was sufficiently thorough to foreclose the conclusion that it was insincere. That Murray Guard decided to credit the statements of Bradley, who Wright claims spread rumors and had a motive to lie, and the statements of Bennett, who Wright claims was acting defensively to prevent her own discharge, was within the company's discretion and does not create an issue of fact as to whether Murray Guard considered race or sex in its decision to terminate Wright.

-33-

*Id.* at 713.

As noted above, the thoroughness of the defendant's investigation of the sexual harassment complaints against Curry and Banks (and others) simply does not permit an inference that race entered into the decision to terminate them in any way. The plaintiffs suggest that the termination followed by days the discovery that they were documenting instances of racially discriminatory behavior. Actually, the gap was a couple months. Nonetheless, the plaintiffs have not pointed to any similarly situated individual who was treated differently in the sexual harassment investigation. Their complaints that Debra Akright engaged in "racist behavior" – a questionable assertion – is entirely unhelpful to their case, because it does not establish that Karen Bugeja, a different supervisor, was influenced by racial animus in her firing decision. The same is true for other incidents of racial insensitivity around the office. A thorough investigation was completed by the defendant, Banks and Curry were allowed to respond to the investigation, and they were fired immediately afterwards. Here, like *Wright*, "[a]t most, [the plaintiff] has presented evidence as to why the allegations of sexual harassment made against him might not be credible, but he has presented no evidence that [the defendant] did not honestly believe they were true or that [the defendant] relied on unlawful motives in terminating [the plaintiff]." *Wright*, 455 F.3d at 714.

Nor has Marie Hillard offered evidence that the failure to assign her to the service leader position more often was motivated in part by consideration of her race. In fact, she has not provided any evidence of the process by which service leaders were selected. Without some information about how service leaders are chosen, there is no evidence from which a reasonable jury could find that race was a motivating factor in the decision not to offer Hillard a service leader position.

The Court will dismiss the claims of disparate treatment by all three plaintiffs.

-34-

C.  Retaliation

Title VII and ELCRA also prohibit retaliation against an employee for complaining about discrimination.  *See* 42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.");  Mich. Comp. Laws § 37.2701(a) (making it unlawful to "[r]etaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act.").  "In order to establish a *prima facie* case of retaliation, a plaintiff must establish that: (1) he engaged in activity protected by Title VII; (2) the exercise of his civil rights was known to the defendant; (3) thereafter, the defendant took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action."  *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

Protected activity "covers conduct such as 'complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices . . . .'"  *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 721 (6th Cir. 2008) (quoting *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 578 (6th Cir. 2000)); *see also Fox v. Eagle Distrib. Co., Inc.*, 510 F.3d 587, 591-92 (6th Cir. 2007) (requiring the substance of the complaint to management be that an employee was "discriminated against on the basis of his [protected status]") (interpreting ADEA), *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1313 (6th Cir. 1989) (holding that an employee must do more than make a "vague charge of discrimination," and that an employee who sent a letter complaining

-35-

that charges against him were the product of "ethnocentrism" did not engage in protected activity

under Title VII). The plaintiff also must show that the protected activity was "'known to those who

made [the adverse employment] decision.'" *Cline v. BWXT Y-12, LLC*, 521 F.3d 507, 513 (6th Cir.

2008) (quoting *Fenton v. HiSAN, Inc.*, 174 F.3d 827, 832 (6th Cir. 1999)) (alteration in original).

The plaintiffs must offer some evidence of a causal connection between the complaints and

the adverse action, which sometimes may consist of temporal proximity. As the Sixth Circuit

explained last year:

> Where an adverse employment action occurs very close in time after an employer
> learns of a protected activity, such temporal proximity between the events is
> significant enough to constitute evidence of a causal connection for the purposes of
> satisfying a *prima facie* case of retaliation. But where some time elapses between
> when the employer learns of a protected activity and the subsequent adverse
> employment action, the employee must couple temporal proximity with other
> evidence of retaliatory conduct to establish causality. *See* [*Little v. BP Exploration
> & Oil Co.*, 265 F.3d 357, 365 (6th Cir. 2001)] ("[T]emporal proximity, when
> considered with the other evidence of retaliatory conduct, is sufficient to create a
> genuine issue of material fact as to" a causal connection.).

*Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008).

If the plaintiff establishes a *prima facie* case, then the defendant may offer a legitimate

business justification for its actions, which the plaintiff must rebut with evidence of pretext.

*Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 597 (6th Cir. 2007). The plaintiff may show

pretext in the same manner as in a disparate treatment theory of discrimination. *Imwalle v. Reliance

Med. Prods., Inc.*, 515 F.3d 531, 545 (6th Cir. 2008).

Only Banks and Curry allege retaliation. They claim that their protected activity consisted

of 1) filing complaints about the noose; 2) Curry "think[ing]" that he reported Younkman's "porch

monkey" comment, Pl.'s Resp., Ex. A, Curry Dep. 146; and 3) Curry complaining to McMillan of

"constant harassment" by Akright, *id.* at 85-87. The complaints about Akright never were based on

-36-

racial animus but simply bad management, and therefore they cannot be protected activity. Moreover, there is no evidence that Bugeja knew that the complaints about the noose were made by Curry or Banks. There is also little evidence of a causal connection between the complaints and the terminations, since the noose incident occurred in September 2004, the "porch monkey" remark happened in March 2005, and the plaintiffs were terminated on May 13, 2005.

But even if Curry and Banks have proved a *prima facie* case of retaliation, they have not shown that the defendant's stated reason for firing them was pretextual, as discussed earlier. The Court concludes, therefore, that the plaintiffs' retaliation claim fails as a matter of law.

### D.  Hostile work environment

"Under Title VII, two types of actions may be brought: (1) 'discrete discriminatory acts,' and (2) claims alleging a 'hostile work environment.'"  *Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 993-94 (6th Cir. 2009) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002)). "Hostile environment claims are different in kind from discrete acts.  Their very nature involves repeated conduct." *Morgan*, 536 U.S. at 115.  Where the prohibition of discrete discriminatory acts guards against illegally motivated adverse employment action, a hostile work environment claim "offers employees protection from a 'workplace[] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. . . .'" *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 514 (6th Cir. 2009) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)) (alteration in original).

"To prove that he was subject to a hostile work environment in violation of Title VII, plaintiff must prove: (1) he belongs to a protected group; (2) he was subject to unwelcome

harassment; (3) the harassment was based on race; (4) the harassment affected a term, condition, or privilege of employment and (5) defendant knew or should have known about the harassment and failed to take action." *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1078-79 (6th Cir. 1999). Under Michigan law, the elements are substantially the same. *See Quinto v. Cross & Peters Co.*, 451 Mich. 358, 368-69, 547 N.W.2d 314, 319-20 (1996). To be actionable, the harassment must be severe and pervasive in two aspects. "Both an objective and subjective test must be met; in other words, the conduct must be so severe or pervasive as to constitute a hostile or abusive working environment both to the reasonable person and the actual victim." *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006).

The Supreme Court has suggested factors to consider in assessing whether a work environment is hostile: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. When the "workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,'" a hostile environment certainly exists. *Id.* at 21; *see also Grace v. USCAR*, 521 F.3d 655, 678-79 (6th Cir. 2008). The court "must consider the totality of the circumstances in determining whether the harassment was sufficiently severe and pervasive." *Randolph*, 453 F.3d at 733.

Although harassment must have "occurred because of the employee's protected status," *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 600 (6th Cir. 2007) (citing *Farmer v.*

-38-

*Cleveland Pub. Power*, 295 F.3d 593, 605 (6th Cir. 2002)), conduct creating a hostile environment need not be focused specifically at the plaintiff. Instead:

> (1) offensive conduct need not be directed at the plaintiff; (2) the plaintiff need not be present at the time of the offensive conduct; instead, she or he can learn of the conduct second-hand; (3) racial or sexual animus can be inferred from conduct not overtly racial or sexual in nature when the context suggests it; and (4) blue collar work environments do not have more leeway when it comes to offensive conduct.

*Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 500 (6th Cir. 2009) (internal citations omitted).

"Depending upon whether the alleged harasser is a co-worker or a supervisor of the victim, there are slightly different standards for evaluating whether the employer as a whole is vicariously liable for the hostile work environment. In the case of a harassing co-worker, '[a]n employer is liable if it knew or should have known of the charged . . . harassment and failed to implement prompt and appropriate corrective action.' [*Hafford v. Seidner*, 183 F.3d 506, 513 (6th Cir. 1999)] (internal quotation marks omitted). By contrast, 'an employer *is* vicariously liable for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee.' *Jackson v. Quanex Corp.*, 191 F.3d 647, 663 (6th Cir. 1999) (emphasis added)." *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 348 (6th Cir. 2005).

There are five incidents over four years in the evidence in this case, which the defendant endeavors to separate and isolate but which the plaintiffs insist must be viewed on a continuum. These incidents are the August 2004 noose incident; the March 2005 "porch monkey" comment; the November 2005 racial graffiti; the November 2005 "Mr. Bojangles" slur; and the August 2008 white supremacist lunch-room flyer. The plaintiffs have the better argument here. The Sixth Circuit has cautioned against separating such incidents and evaluating them individually, since that practice tends to ignore the totality of the circumstances, which must be considered, and "rob[s] the incidents

-39-

of their cumulative effect." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 561 (6th Cir. 1999).

When determining hostility, context matters. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523

U.S. 75, 81-82 (1998) ("The real social impact of workplace behavior often depends on a

constellation of surrounding circumstances, expectations, and relationships which are not fully

captured by a simple recitation of the words used or the physical acts performed. Common sense,

and an appropriate sensitivity to social context, will enable courts and juries to distinguish between

simple teasing or roughhousing among members of the same sex, and conduct which a reasonable

person in the plaintiff's position would find severely hostile or abusive."). Consequently, "where

individual instances of [racial] harassment do not on their own create a hostile environment, the

accumulated effect of such incidents may result in a Title VII violation." *Williams*, 187 F.3d at 563.

 All plaintiffs allege a hostile work environment, and all plaintiffs witnessed the noose and

overheard the "porch monkey" comment. Banks and Curry further allege that they were treated

worse than their white peers by a manager, Debra Akright. Hillard relies on a number of additional

incidents, including being called a "french maid," viewing the "no niggers" graffiti on the door, and

reading the racially derogatory flyer.

 The noose incident is undoubtedly among the most serious of the plaintiffs' allegations, since

it is pregnant with historical and cultural meaning. As the Tenth Circuit recently explained:

> [C]ourts have recognized that a noose may constitute part of a hostile environment
> claim. *See* [*Hollins v. Delta Airlines*, 238 F.3d 1255, 1256-58 (10th Cir. 2001)]
> (noting that "several hangman's nooses dangling from the ceiling above [the
> plaintiff's] work area" coupled with racist jokes, including one about lynching, were
> sufficient to give rise to an inference of a hostile environment); *see also Vance v. S.
> Bell Tel. & Tel. Co.*, 863 F.2d 1503, 1511 n.4 (11th Cir. 1989) ("It is hard to imagine
> an incident of this sort taking place in 1984. The grossness of hanging an object
> resembling a noose at the work station of a black female is self-evident."), *abrogated
> on other grounds by Harris*, 510 U.S. at 21; *Vance v. S. Bell Tel. & Tel.*, 983 F.2d
> 1573, 1583 (11th Cir. 1993) (Fay, J., dissenting) ("The noose in [the workplace]

context is a symbol not just of racial discrimination or of disapproval, but of terror. . . . Not less than the swastika or the Klansman's hood, the noose in this context is intended to arouse fear."); *Williams v. New York City Housing Auth.*, 154 F. Supp. 2d 820, 824 (S.D.N.Y. 2001) ("Indeed, the noose is among the most repugnant of all racist symbols, because it is itself an instrument of violence.").

Like "a slave-masters whip," the image of a noose is "deeply a part of this country's collective consciousness and history, any [further] explanation of how one could infer a racial motive appears quite unnecessary." *Johnson v. Potter*, 177 F. Supp. 2d 961, 965 (D. Minn. 2001); *see also V[a.] v. Black*, 538 U.S. 343, 388 . . . (2003) (Thomas, J., dissenting) (stating that "[i]n every culture, certain things [both "sacred" and "profane"] acquire meaning well beyond what outsiders can comprehend" and discussing cross burning as an example).

*Tademy v. Union Pac. Corp.*, 520 F.3d 1149, 1159 (10th Cir. 2008). A reasonable jury could discredit an employee's race-neutral explanation for hanging a life-sized noose. *Ibid.* Here, all three plaintiffs witnessed a noose in their place of employment. Although there is evidence that the person who placed the noose did so for non-discriminatory reasons, a jury could reasonably find to the contrary. *Ibid.*; *see also id.* at 1162 (holding that "a jury could easily find that the noose was an egregious act of discrimination calculated to intimidate African-Americans"). It is true that the noose by itself is not as compelling a case for a hostile work environment as it would be with other racially-charged comments. *Cf. id.* at 1163 ("The noose incident must also be viewed in light of the fact that Mr. Tademy was aware of the 'hang all niggers and jews' graffiti, a fact that understandably intensified his reaction."). But the evidence in this case included other racially significant events. The "porch monkey" comment, for instance, likely would not by itself rise to the level of severity to constitute a hostile work environment. *See Ladd*, 552 F.3d at 500. However, that comment is part of the circumstances, the totality of which must be considered in an assessment of the hostility of the workplace to the minority plaintiffs.

The noose incident takes on greater significance in the present case because it was witnessed by the regional manager Bugeja, who did not act promptly in taking it down, allegedly because she perceived it (remarkably) as a race-neutral joke. A supervisor allowing this symbol to be seen by others makes the defendant vicariously liable for the hostile work environment that symbol creates. *See Clark*, 400 F.3d at 348. Moreover, the defendant's response to the noose incident – a thorough investigation, culminating in a reprimand to the person who put it up, and a "mandatory" diversity training that was not attended by Bugeja and possibly others – could be found by a jury to be an unsatisfactory response.

With respect to all three plaintiffs, the Court finds that the record establishes a substantial question of material fact as to whether the work environment on the third floor of the defendant's Saginaw facility was hostile to the plaintiffs because of their race.

### III.  Conclusion

The Court finds that the plaintiffs have not established jury-submissible fact questions on their disparate treatment claims under theories of direct evidence, circumstantial evidence, or mixed-motive. Nor have the plaintiffs produced proof that establishes a material fact question on their retaliation claims. There are material fact questions precluding summary judgment on the plaintiffs' hostile work environment theory.

Accordingly, it is **ORDERED** that the defendant's motion for summary judgment [dkt #133] is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that those parts of Counts I, II, and III of the amended complaint alleging disparate treatment and retaliation are **DISMISSED WITH PREJUDICE**.

s/David M. Lawson

-42-

DAVID M. LAWSON
United States District Judge

Dated:   October 30, 2009

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served
upon each attorney or party of record herein by electronic means or first
class U.S. mail on October 30, 2009.

s/Teresa Scott-Feijoo
TERESA SCOTT-FEIJOO